STATE of Wisconsin, Plaintiff-Respondent,

v.

Tonnie D. ARMSTRONG, Defendant-Appellant.†

Supreme Court

*Nos. 97–0925–CR, 97–0926–CR. Oral argument September 17, 1998.—Decided January 21, 1999.*

(Also reported in 588 N.W.2d 606.)

†Motion for reconsideration denied April 20, 1999.

331

333

For the defendant-appellant there were briefs by *Steven A. Koch* and *Seymour, Kremer, Nommensen, Morrissy & Koch*, Elkhorn, and oral argument by *Steven A. Koch*.

For the plaintiff-respondent the cause was argued by *David J. Becker*, assistant attorney general, with

whom on the brief was *James E. Doyle,* assistant attorney general.

¶ 1.   N. PATRICK CROOKS, J.   These cases are before the court on certification by the court of appeals, pursuant to Wis. Stat. § (Rule) 809.61 (1995–96).[1] Police officers investigating a homicide interviewed Tonnie D. Armstrong (Armstrong) at the county jail, where Armstrong was serving time for an unrelated offense. Armstrong made oral statements incriminating himself in the homicide. At the end of the interview, the officers administered the *Miranda* warnings[2] to Armstrong for the first time. About two hours later, they presented Armstrong with a written statement memorializing the earlier unwarned statements. Armstrong reviewed and altered the written statement, and after the officers read the *Miranda* warnings a second time, Armstrong initialed and signed it.

¶ 2.   Based on Armstrong's oral and written statements, the State charged Armstrong with first-degree intentional homicide, theft from a person, and bail jumping. Before trial, Armstrong filed a motion challenging the admissibility of his statements. Following Circuit Court Judge Emmanuel J. Vuvunas' ruling that the oral and written statements were admissible, Armstrong entered into a plea agreement in which he pled guilty to second-degree reckless homicide, theft from a person, and bail jumping as a habitual offender.[3] Armstrong was convicted of all

---

[1] Unless otherwise noted, all references to the Wisconsin Statutes are to the 1995–96 version.

[2] *See Miranda v. Arizona,* 384 U.S. 436 (1966).

[3] Armstrong also agreed to probation revocation and resentencing for his conviction in case number 97–0925–CR of

charges and was sentenced to a total of twenty-six years in prison. Armstrong appealed the portion of the final order which denied his motion challenging the admissibility of the statements, and the court of appeals certified the matter to this court.

¶ 3. This court is confronted with two primary issues on this appeal. First, we must determine the admissibility of the oral statements which Armstrong made before receiving his *Miranda* warnings. Second, we must decide the admissibility of the written statement which reiterated Armstrong's earlier unwarned oral statements and which Armstrong signed after receiving his *Miranda* warnings and after signing a form stating that he understood and waived his rights.[4]

¶ 4. Upon review, we conclude that Armstrong's oral statements were inadmissible because Armstrong

---

theft from a person. Case number 97–0925–CR is now the companion case to the main case before us, case number 97–0926–CR.

[4] The court of appeals set forth the following issues when it certified Armstrong's appeal to this court:

1. Who has the burden of proof on a *Miranda* custody question?

2. On the issue of custody, is the language of *Mathis v. United States*, 391 U.S. 1 (1968), to be read literally or limited as indicated by other federal and state cases? More specifically, is *Schimmel v. State*, 84 Wis. 2d 287, 294, 267 N.W.2d 271, 274 (1978), *overruled on other grounds by Steele v. State*, 97 Wis. 2d 72, 294 N.W.2d 2 (1980) (where it appears the court accepted the State's concession that a defendant was in custody for purposes of *Miranda* by being an inmate in the Wisconsin prison system) still the law in Wisconsin?

3. On the issue of interrogation, should the language of *Rhode Island v. Innis*, 446 U.S. 291 (1980), be read as broadly as it appears, or should Wisconsin follow the lead of some of the federal cases and other states which look to the totality of the circumstances to see if a *Miranda*-type interrogation occurred?

made the statements during custodial interrogation and before the administration of *Miranda* warnings. However, the circuit court properly ruled that Armstrong's written statement was admissible pursuant to *Oregon v. Elstad*, 470 U.S. 298 (1985). In light of our ruling that Armstrong's written statement was admissible, we conclude that the circuit court's decision to admit the oral statements constituted harmless error. Accordingly, we affirm the judgment of the circuit court.

## I.

¶ 5. This case involves the admissibility of statements made by Tonnie Armstrong during two meetings with police officers on July 31, 1995. On that day, Armstrong was serving time at the Racine County Jail as a result of his conviction in an earlier case, case number 97–0925–CR. The conviction arose out of an incident on May 9, 1995, in which Armstrong snatched a woman's purse. Armstrong pled guilty to theft from a person and was convicted on June 1, 1995.[5]

¶ 6. From June 1, 1995, until his sentencing hearing on July 13, 1995, Armstrong was free on bond. The circuit court, Judge Emmanuel J. Vuvunas presiding, withheld Armstrong's sentence and placed him on probation for three years. As a condition of the proba-

---

4. In light of the above, is the holding of *State v. Ambrosia*, 208 Wis. 2d 269, 560 N.W.2d 555 (Ct. App. 1997), a proper application of *Oregon v. Elstad*, 470 U.S. 298 (1985)?

Certification by Court of Appeals at 1–2 (footnote omitted). We will answer these issues in the course of this opinion.

[5] Armstrong was originally charged with strong armed robbery. The charge was later amended to theft from a person in violation of Wis. Stat. § 943.20(1)(a), (3)(d)2.

tion, Armstrong was required to serve four months in the Racine County Jail.

¶ 7.  On the morning of June 29, 1995, Detective Steve Mich of the City of Racine Police Department discovered the body of Donald Thomas. Thomas' body was lying on the floor of the bookstore he owned, and his wallet and keys were missing. An autopsy suggested that Thomas had died of asphyxiation and had probably been choked.

¶ 8.  Police investigators soon learned that Armstrong had been in Thomas' bookstore the night before Thomas' body was found. Detective Mich and another officer went to the Racine County Jail on July 31, 1995, to speak with Armstrong about the homicide. The officers met with Armstrong at about 2:15 p.m. in an interview room in the jail's main level intake area.

¶ 9.  Detective Mich began by telling Armstrong that the officers were there to talk to him about the death of Donald Thomas. Neither officer read Armstrong his *Miranda* warnings at the start of the interview. According to the officers, information they had received from an employee of Thomas' bookstore had caused them to believe that Armstrong may have witnessed something which would assist them in their investigation.[6] Detective Mich later testified that the officers did not suspect Armstrong of involvement in the crime when they went to talk with him.

¶ 10.  Armstrong proceeded to tell the officers that he was present when Thomas died and that he and

_____

[6] The bookstore employee told police that Armstrong was in Thomas' bookstore on June 29, 1995, the night before Thomas' body was found there. According to the employee, Armstrong left the store about a half hour before the employee left at 1:30 a.m., at which time Thomas was still alive.

Thomas had argued that night.[7] Armstrong admitted that he had choked Thomas with both hands for about ten seconds, stopped, and then grabbed him by the front of his shirt and shook him until Thomas went limp and fell to the floor. Armstrong also recounted his actions after Thomas died, including his removal of Thomas' wallet and keys and exit from the bookstore. At some point, Armstrong drew the officers a map showing where he disposed of the wallet and keys.[8]

¶ 11. During the interview, the officers asked Armstrong questions. Detective Mich told Armstrong that he did not believe some of Armstrong's statements, including his story about which route he took home from the store and his version of the events which transpired inside the store. According to Detective Mich, the first moment at which he began to suspect that Armstrong might have been involved in Thomas' death was when Armstrong told him that he and Thomas had argued and that he had placed his hands on Thomas.[9]

¶ 12. At about 3:00 p.m., the officers administered *Miranda* warnings to Armstrong for the first

---

[7] Detective Mich testified at the preliminary hearing that Armstrong told him that the argument ensued over a debt allegedly owed by Armstrong to Thomas. Detective Mich stated that he and Armstrong together estimated the amount of the debt to be around $100. *See* Prelim. Hearing Tr., Sept. 8, 1995 at 13–14 (No. 97–0926–CR).

[8] The motion hearing testimony is somewhat unclear as to precisely when the map was drawn. The circuit court concluded that the map was drawn partly before and partly after Armstrong was read the *Miranda* warnings at the first interview. *See* Motion Hearing Tr., Feb. 2, 1996 at 19 (No. 97–0926–CR).

[9] *See* Motion Hearing Tr., Jan. 19, 1996 at 41–42 (No. 97–0926–CR).

time.[10] Detective Mich read the warnings directly from a "Notification and Waiver of Rights" form. Armstrong signed the top portion of the form, which set forth the text of the warnings.[11] However, he refused to sign the waiver of rights printed on the bottom part of the form.[12]

¶ 13.    Nevertheless, Armstrong told the officers that he understood the *Miranda* warnings and would speak with them. The only conversation after the warnings, however, consisted of a brief discussion of whether Armstrong would accompany the officers on their attempt to locate Thomas' wallet and keys. It was decided that Armstrong would remain at the jail. Armstrong finished constructing the map and the officers left, taking the map with them.

¶ 14.    In its entirety, the first interview lasted about an hour. Afterward, the officers left the jail and drove to the place depicted on the map, where they located Thomas' wallet and keys. Detective Mich returned to the police department and reduced Arm-

[10] Detective Mich testified at the motion hearing that he read Armstrong his rights at this point in the interview "[b]ecause I believed him now." *See* Motion Hearing Tr., Jan. 19, 1996 at 24 (No. 97–0926–CR).

[11] Armstrong does not challenge the substance of the warnings.

[12] The bottom portion of the form read,

> I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made against me and no pressure or coercion of any kind has been used against me.

According to Detective Mich, the officers did not press Armstrong to sign this bottom portion of the form, in part because they felt that they had finished the interview. *See* Motion Hearing Tr., Jan. 19, 1996 at 24–25 (No. 97–0926–CR).

strong's oral statements to writing in a document he labeled, "Sworn Affidavit." It is undisputed that this written statement was based completely on Armstrong's previous oral statements.

¶ 15. The officers returned to the jail at about 5:10 p.m. the same day, July 31, 1995, with the written statement, which they presented to Armstrong. Armstrong reviewed the statement and made some changes in it.[13] When he was finished, Detective Mich administered the *Miranda* warnings for the second time, reading them from another copy of the "Notification and Waiver of Rights" form. This time, Armstrong signed both the top "notification" and bottom "waiver" portions of the form. Armstrong then returned to the written statement prepared by Detective Mich, initialed each change he had made, and signed the statement. Nothing further occurred in this second meeting between the officers and Armstrong.[14]

---

[13] Armstrong made the following changes in the statement: (1) replaced "three or four" with "one" in the phrase, "I had watched three or four peep shows"; (2) replaced "and" in the phrase "and I told him that I would start paying" with an illegible word ("him" refers to Donald Thomas); (3) replaced "I knew he was dead" with "He was unconscious" ("he" refers to Thomas); and (4) crossed out the sentence, "I knew he had a bad heart" (again, "he" refers to Thomas). Armstrong later testified that the written statement was accurate and was the same as the statements he had made earlier. *See* Motion Hearing Tr., Jan. 19, 1996 at 70–72 (No. 97–0926–CR).

[14] Police officers met with Armstrong for a third time on August 2, 1995. At that meeting, Armstrong was asked whether he wanted a lawyer, and he gave a general reply along the lines of "maybe I should." The circuit court ruled that this statement was inadmissible because the officer had not either clarified it or attempted to obtain a waiver of Armstrong's right to an

¶ 16.   In an information filed October 5, 1995, the State charged Armstrong with first-degree intentional homicide, theft from a person, and bail jumping, all as a habitual offender.[15] Armstrong filed a pre-trial motion on November 15, 1995, challenging the admissibility of his oral statements and the written statement.

¶ 17.   Hearings on the motion were held on January 19, 1996, and February 2, 1996. The circuit court, Judge Emmanuel J. Vuvunas presiding, ruled that the statements Armstrong made at the first and second interviews were admissible. Judge Vuvunas began by stating that he found the police officers to be "credible" and that he believed them when they said that they did not think Armstrong was a suspect at the start of the first interview. Motion Hearing Tr., Feb. 2, 1996 at 18 (No. 97–0926–CR). In regard to the oral statements, Judge Vuvunas ruled,

> I'm satisfied that when the officer realized that [Armstrong] was, in fact, making statements that might be incriminating, they gave him his rights. He did not—he did acknowledge. . .the fact that his

attorney. The State does not challenge that ruling, and the third meeting is not otherwise relevant to this appeal.

[15] More specifically, Armstrong was charged with homicide under Wis. Stat. § 940.01, theft from a person in violation of Wis. Stat. § 943.20(1)(a), (3)(d)2, and bail jumping under Wis. Stat. § 946.49(1)(b). Armstrong was charged with all three offenses as a habitual offender pursuant to Wis. Stat. § 939.62 because he committed the three offenses within five years of his conviction of theft from a person in case number 97–0925–CR. The habitual offender statute increases the maximum term of imprisonment for crimes committed by persons who have been convicted of certain other crimes within the previous five years. *See* Wis. Stat. § 939.62.

rights were given. He did not sign the waiver. I don't find that to be telling here. I believe the officers that even though he said he didn't want to sign the waiver, but he did want to continue talking, and did it's clear that he was talking and drawing and doing things both before this, these rights were given[,] and after,. . .so I find that they did comply with *Miranda*. . .once they were appraised and knew that he, in fact, was a suspect in this matter, and that the statements made on that occasion were voluntary by Mr. Armstrong.

Motion Hearing Tr., Feb. 2, 1996 at 19 (No. 97–0926–CR). Consequently, the circuit court held that Armstrong's oral statements were admissible.

¶ 18.  The court also ruled that Armstrong's written statement was admissible. The court reasoned that Armstrong had made the statement after receiving his *Miranda* warnings at the first meeting about two hours earlier. The court found that Armstrong "understood what he was doing, that he understood the warnings of *Miranda* and was making a statement voluntarily." Motion Hearing Tr., Feb. 2, 1996 at 19 (No. 97–0926–CR).

¶ 19.  After the circuit court's ruling that Armstrong's statements were admissible, Armstrong entered into a plea agreement.[16] Pursuant to the agreement, Armstrong pled guilty to second-degree reckless homicide, theft from a person, and bail jumping as a habitual offender.[17] In addition, Armstrong

---

[16] The parties entered the agreement during the hearing. Apparently, the parties had made alternative plea agreements and the choice of agreement was dependent on the circuit court's ruling on the motion.

[17] The record contains no amended information, but the State clearly amended the information orally at the motion

agreed to refuse the probation which was imposed upon him and to be re-sentenced for his conviction of theft from a person in case number 97–0925–CR. Armstrong was convicted of all three charges, and on April 11, 1996, was sentenced to a total of twenty-six years in prison.[18] Armstrong appealed the portion of the final order in which the court denied his motions challenging the admissibility of the statements. The court of appeals certified the matter to this court.

## II.

¶ 20.  As a threshold matter, we determine which party bears the burden of proof[19] on the issue of whether a "custodial interrogation" occurred. Determining whether a custodial interrogation occurred is the first step in an inquiry of whether statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), because *Miranda* warnings need only be

hearing. *See* Motion Hearing Tr., Feb. 2, 1996 at 21 (No. 97–0926–CR). Essentially, the count of first-degree intentional homicide was amended to a count of second-degree reckless homicide, which is defined by Wis. Stat. § 940.06. Also, the increased penalty for habitual offenders was applied only to the bail jumping count.

[18] At the sentencing hearing, the court sentenced Armstrong for the three counts in case number 97–0926–CR and the one count in case number 97–0925–CR. The court imposed sentences of ten years on the homicide charge, five years on each theft charge, and eleven years as a habitual offender on the bail jumping charge. Except for one of the five-year theft sentences, the sentences are to be served consecutively.

[19] In this opinion, the term "burden of proof" includes both the burden of production of evidence and the burden of persuasion. We used "burden of proof" in the same way in *State v. Santiago*, 206 Wis. 2d 3, 19, 556 N.W.2d 687 (1996).

administered to individuals who are subjected to a custodial interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *Miranda*, 384 U.S. at 444, 477; *State v. Mitchell*, 167 Wis. 2d 672, 686, 482 N.W.2d 364 (1992). The allocation of the burden of proof is important in this case because the record provides only sketchy information about the circumstances of the interview between Armstrong and the police.

¶ 21.	We conclude that the State must establish by a preponderance of the evidence whether a custodial interrogation took place. Although Wisconsin courts have not yet ruled directly on the precise issue, our holding is consistent with Wisconsin precedent which places the burden of proving other aspects of *Miranda* on the State. Moreover, our holding is consistent with federal law, including the *Miranda* decision itself.

¶ 22.	Wisconsin courts have not directly decided which party possesses the burden of establishing whether a custodial interrogation occurred, although language in *State v. Mitchell*, 167 Wis. 2d 672, 696, 482 N.W.2d 364 (1992), suggests that the burden is on the State. In *Mitchell*, we stated, "Once the state has established a prima facie case of waiver of *Miranda* rights and voluntariness of a statement of an *in-custody police interrogation* in the absence of countervailing evidence, the statement should be admitted into evidence." *Mitchell*, 167 Wis. 2d at 696 (citing *State v. Hernandez*, 61 Wis. 2d 253, 259, 212 N.W.2d 118 (1973))(emphasis added). Wisconsin courts have placed the burden of proving other aspects of *Miranda* squarely on the State. It is well established that the State must show that the defendant received and understood his or her *Miranda* warnings. *See Mitchell*,

345

167 Wis. 2d at 696–97; *Hernandez*, 61 Wis. 2d at 258. The State must show that the defendant knowingly and intelligently waived the constitutional rights protected by the *Miranda* warnings. *See State v. Santiago*, 206 Wis. 2d 3, 12, 556 N.W.2d 687 (1996); *Mitchell*, 167 Wis. 2d at 696–97; *Hernandez*, 61 Wis. 2d at 258. The State also bears the burden on the issue of whether the warnings were sufficient in substance. *Santiago*, 206 Wis. 2d at 12.

¶ 23.    Further, in *State ex rel. Goodchild v. Burke*, 27 Wis. 2d 244, 262, 133 N.W.2d 753 (1965), this court held that a separate hearing before the trial judge is required in order to determine whether a defendant's admission was voluntary. *Goodchild*, 27 Wis. 2d at 262. The State bears the burden on the issue of voluntariness in *Goodchild* hearings. *See Goodchild*, 27 Wis. 2d at 264–65. In *Roney v. State*, 44 Wis. 2d 522, 534, 171 N.W.2d 400 (1969), we ruled that *Miranda* objections also require a hearing. We went on to "adopt the procedure of the *Goodchild* hearing in determining *Miranda* questions," and to hold that the *Miranda* and *Goodchild* hearings may be held together. *Roney*, 44 Wis. 2d at 534. We stated:

> [I]n each case, whether the challenge is under *Goodchild* or under *Miranda*, substantially the same type of inquiry must be made by the court. In *Miranda* the question is, was the confession or other statement obtained under such circumstances of custodial interrogation as to require the exclusion of the statement from evidence. In *Goodchild* the question is, was the statement involuntary and therefore should be excluded from evidence. . . .

We therefore conclude that *Miranda*, like *Good-child*, should require a hearing by the trial judge out of the presence of the jury.

The *Goodchild* procedure has been outlined in the case bearing that same name. *A similar procedure should be followed in the event of a Miranda objection.* The court should determine the merits of that objection sitting alone, out of the presence of the jury and preferably, as in *Goodchild*, in a pretrial proceeding. Following such a hearing in which the facts are heard, the court's finding would have to be made beyond a reasonable doubt and *the [S]tate would have the burden of proving compliance with Miranda or a waiver of those requirements* . . . .

*Id.* at 533–34 (emphasis added). Because the State bears the burden of proof in *Goodchild* hearings as to whether a defendant's admission or confession was voluntary, it follows that the State should bear the burden of proof in *Miranda* hearings on the issue of whether a custodial interrogation occurred. *See Goodchild*, 27 Wis. 2d at 264–65. A holding to the contrary would seem to be inconsistent with this court's holding in *Roney*.

¶ 24. Requiring the State to establish whether a custodial interrogation took place also comports with the reasoning of the United States Supreme Court in *Miranda*. In *Miranda*, the Court placed the burden of showing that the defendant waived the constitutional privilege protected by the *Miranda* warnings on the government. *See Miranda*, 384 U.S. at 475. Although the burden on the issue of waiver is distinct from the burden of establishing that a custodial interrogation took place, the Court's reasoning applies with equal force to the question we face in this case. The Court stated:

347

This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst*, 304 U.S. 458 (1938), and we re-assert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.

*Id.*; *see also Tague v. Louisiana*, 444 U.S. 469, 470–71 (1980)(citing this language from *Miranda* with approval).[20]

---

[20] The State relies on *Berkemer v. McCarty*, 468 U.S. 420 (1984) as support for the proposition that the United States Supreme Court has placed the burden of establishing custodial interrogation on the defendant. In particular, the State points to the following language from *Berkemer*: "[R]espondent has failed to demonstrate that, at any time between the stop and the arrest, he was subjected to restraints comparable to those associated with a formal arrest." *Berkemer*, 468 U.S. at 441. When coupled with the Court's holding that the *Berkemer* respondent was not in custody, the State argues, the quoted language shows that the Supreme Court placed the burden of establishing a custodial interrogation on the defendant. *See id.*

We are not persuaded that the quoted language from *Berkemer* reflects a desire by the United States Supreme Court to place the burden on the issue of custodial interrogation upon the defendant rather than the State. The language cited by the State is the only reference made in the decision to the allocation of burdens of proof. Further, the language appears near the end of a discussion of "whether the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered 'custodial interrogation.' " *Id.* at 435. The issue of which party bore the burden of proving that a custodial interrogation took place was not squarely before the Court.

¶ 25. Applying this reasoning to the current situation, we conclude that the State should be required to establish whether a custodial interrogation took place. The State is responsible for creating the custodial situation, and the State conducts and controls the interrogation. Further, as a result of its record-keeping practices, the State is more likely to reduce an interview to writing or have other "corroborated evidence" of the interrogation session. Indeed, the Court in *Miranda* noted that the atmosphere of custodial interrogation was a "police-dominated" one. *Miranda*, 384 U.S. at 445. A defendant in such an environment is less likely to be familiar with his or her surroundings or to otherwise be able to provide evidence of the circumstances of the custody or interrogation. Therefore, under the reasoning of *Miranda*, the State is the party better suited to bear the burden of establishing whether a custodial interrogation took place.[21]

¶ 26. Federal and Wisconsin law are clear that the standard of proof which the State must meet in

---

[21] Both sides refer to the analysis for allocating burdens of proof which this court employed in *State v. McFarren*, 62 Wis. 2d 492, 215 N.W.2d 459 (1974). In *McFarren*, we stated that a court should take five factors from McCormick, *Handbook of the Law of Evidence*, § 337 at 787–89 (2d ed. 1972), into account when determining which party bears the burden of proof. *See McFarren*, 62 Wis. 2d at 499–503. Stated concisely, the factors are: "(1) the natural tendency to place the burden on the party desiring change; (2) special policy considerations such as those disfavoring certain defenses; (3) convenience; (4) fairness; and (5) the judicial estimate of probabilities." *State v. Big John*, 146 Wis. 2d 741, 755, 432 N.W.2d 576 (1988). In this case, an analysis based on the *McFarren* factors appears unnecessary given the Wisconsin and federal precedent supporting our decision to place the burden on the State.

proving compliance with *Miranda* is preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986)(stating that preponderance of the evidence is the appropriate standard of proof whenever the State bears the burden of proving waiver of the rights protected by Miranda); *Santiago*, 206 Wis. 2d at 12 (holding that the State must prove the sufficiency of the *Miranda* warnings and waiver of *Miranda* rights by a preponderance of the evidence); *State v. Jones*, 192 Wis. 2d 78, 114a, 532 N.W.2d 79 (1995)(per curiam on motion for reconsideration)(striking from the court's original opinion the statement that the State must prove waiver of *Miranda* rights beyond a reasonable doubt and instead imposing the preponderance of the evidence standard). As the United States Supreme Court stated in *United States v. Matlock*, 415 U.S. 164, 178, n.14 (1974), "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence. . . ." *See also Connelly*, 479 U.S. at 168 (citing this language from *Matlock* with approval); *State v. Rewolinski*, 159 Wis. 2d 1, 16 n.7, 464 N.W.2d 401 (1990)(quoting this language from *Matlock*); *State v. Lee*, 175 Wis. 2d 348, 364, 499 N.W.2d 250 (Ct. App. 1993)(holding, based on *Connelly* and *Rewolinski*, that the State must prove waiver of *Miranda* rights by a preponderance of the evidence). Accordingly, we hold that the State must meet its burden of establishing whether a custodial interrogation occurred by a preponderance of the evidence.[22]

---

[22] In Wisconsin, "preponderance of the evidence" is equivalent to the civil "greater weight of the credible evidence" standard of proof. Wis. JI—Civil 200 and Comment; *Santiago*, 206 Wis. 2d at 12, n.5.

¶ 27.    For the reasons stated, we hold that the State possesses the burden of establishing whether a custodial interrogation occurred such that *Miranda* warnings were required. The State must meet this burden by a preponderance of the evidence.

## III.

¶ 28.    Next, we consider the admissibility of the incriminating oral statements Armstrong made before he received his *Miranda* warnings. In short, we hold that Armstrong's oral statements are inadmissible because they were obtained in violation of *Miranda*.

¶ 29.    In *Miranda*, the United States Supreme Court held that law enforcement officers conducting a "custodial interrogation" must employ "procedural safeguards" sufficient to protect a defendant's Fifth Amendment and Fourteenth Amendment privilege against compelled self-incrimination.[23] *Miranda*, 384 U.S. at 444; *see also Innis*, 446 U.S. at 297. The Court spelled out a list of "procedural safeguards" which it considered sufficient; these safeguards are commonly called "*Miranda* warnings."[24] Law enforcement officers must administer *Miranda* warnings at the first

---

[23] The Fifth Amendment to the United States Constitution provides that no "person. . .shall be compelled in any criminal case to be a witness against himself." The Fourteenth Amendment of the federal constitution requires state courts to observe this privilege against compelled self-incrimination. *Malloy v. Hogan*, 378 U.S. 1, 3 (1978).

[24] The administration of *Miranda* warnings involves informing a person that he or she has the right to remain silent, that any statement he or she makes can be used as evidence against the person, that he or she has the right to have an attorney present during the interrogation, and that if the per-

moment an individual is subjected to "custodial inter-rogation." *Miranda*, 384 U.S. at 444, 477; *see also Innis*, 446 U.S. at 300; *Mathiason*, 429 U.S. at 495; *Mitchell*, 167 Wis. 2d at 686. In other words, police must read the *Miranda* warnings to any person who is both "in cus-tody" and under "interrogation." *Mitchell*, 167 Wis. 2d at 686.

¶ 30.    As we have already decided, the State had the burden of showing whether Armstrong was the subject of a custodial interrogation. During oral argu-ment, the State admitted that if it bore the burden on the issue of custodial interrogation, then the State had failed to meet it.[25] We consider those issues in the interest of judicial economy where, as here, the issues were fully briefed and are likely to recur. *See State ex rel. Jackson v. Coffey*, 18 Wis. 2d 529, 532, 118 N.W.2d 939 (1963); *Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938).[26]

¶ 31.    We note at the outset of our discussion that this court will not set aside the circuit court's findings of fact unless they are "clearly erroneous." *State v. Cun-ningham*, 144 Wis. 2d 272, 282 (1988); Wis. Stat. § 805.17(2). We must give "due regard" to the circuit

---

son wants an attorney but cannot afford one, an attorney will be appointed for the person. *See Miranda*, 384 U.S. at 445, 467–73.

[25] Counsel's exact statement was, "If the burden of proof is on the State, then I don't think we have estab-lished. . .affirmatively that there wasn't custody, and. . .I think that we probably have not affirmatively established that there wasn't interrogation."

[26] The parties in this case briefed and argued the issues of custody and interrogation and that the court of appeals raised both issues when it certified Armstrong's appeal to this court.

court's opportunity to observe the witnesses and determine their credibility. Wis. Stat. § 807.15(2). The determination of whether the facts in this case meet the appropriate legal standards presents a question of law which we may decide independently of the circuit court. *Cunningham*, 144 Wis. 2d at 282.

¶ 32. In general, a person is "in custody" for purposes of *Miranda* when he or she is "deprived of his [or her] freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 477. A person may be deemed to be "in custody" in a broad variety of settings. For example, a person in his or her own bedroom is "in custody" if the person has been placed under arrest and is not free to go wherever he or she wants. *See Orozco v. Texas*, 394 U.S. 324, 327 (1969). Of relevance to this case, the United States Supreme Court has ruled that a prison inmate was "in custody" for purposes of *Miranda* even though he was questioned about a situation distinct from the one for which he was incarcerated. *See Mathis v. United States*, 391 U.S. 1, 4–5 (1968).

¶ 33. The State argues that Armstrong was not "in custody" when he made his oral statements, and therefore, his statements are admissible even in the absence of *Miranda* warnings. Since there was no change in Armstrong's custodial status concurrent with the time at which officers arguably began interrogating Armstrong, the State reasons, Armstrong was not "in custody" because he was free to get up out of the jailhouse interview room and walk back to his cell.

¶ 34. We reject this argument as directly contrary to *Mathis* and its Wisconsin counterpart, *Schimmel v. State*, 84 Wis. 2d 287, 267 N.W.2d 271

(1978).[27] The defendant in *Schimmel* was an inmate at the Wisconsin State Reformatory at Green Bay (now the Green Bay Correctional Institution). *See Schimmel,* 84 Wis. 2d at 288. While attending a Division of Corrections alcohol treatment program at the Winnebago Mental Health Institute, the defendant went to the office of the Division of Corrections employee who was in charge of the program and told him that he had killed a waitress and had tried to rape her. *Id.* at 288–89. The employee called the police. *Id.* at 289. After the officers arrived and read the defendant his *Miranda* warnings, the defendant told them the same story. *Id.* at 289–90.

¶ 35. This court upheld the circuit court's ruling in *Schimmel* that the defendant's statements to the employee were admissible in the absence of *Miranda* warnings because the statements did not stem from interrogation and were made voluntarily. *See id.* at 297–98. This court stated, "There can be no question that the defendant was in custody at the time he made the statement to [the employee]." *Id.* at 294. As support for our holding, we quoted directly from *Mathis*:

> "The Government also seeks to narrow the scope of the *Miranda* holding by making it applicable only to questioning one who is 'in custody' in connection with the very case under investigation. There is no substance to such a distinction, and in effect it goes against the whole purpose of the *Miranda* decision which was designed to give meaningful protection to Fifth Amendment rights. We find nothing in the *Miranda* opinion which calls for a curtailment of the warnings to be given persons under interrogation

---

[27] *Schimmel v. State,* 84 Wis. 2d 287, 267 N.W.2d 271 (1978), was overruled on other grounds by *Steele v. State,* 97 Wis. 2d 72, 294 N.W.2d 2 (1980).

by officers based on the reason why the person is in custody."

*Id.* at 294–95 (quoting *Mathis*, 391 U.S. at 4–5).

¶ 36.    Today, we reaffirm our decision in *Schimmel* and hold that a person who is incarcerated is *per se* in custody for purposes of *Miranda*.[28] *See also State v.*

---

[28] The State argues that this court's holding in *Schimmel* that the defendant was in custody is of no precedential value because the *Schimmel* court noted that the State "apparently concede[d] that the defendant was in custody." *Schimmel*, 84 Wis. 2d at 295. As support for this argument, the State relies primarily upon *Wilson v. State*, 82 Wis. 2d 657, 264 N.W.2d 234 (1978). Quoting from *Wilson*, the State contends, "A holding that is based on a concession by the [S]tate 'has no precedential value' in this state." State's Br. at 24 (quoting *Wilson*, 82 Wis. 2d at 663).

This court does not read *Wilson* as establishing such a broad rule. An examination of the pertinent discussion in *Wilson* is illuminating. The discussion concerned *Harris v. State*, 78 Wis. 2d 357, 254 N.W.2d 291 (1971), which the defendant cited in support of the argument that he should be given credit for time served against all of his sentences. *Wilson*, 82 Wis. 2d at 663. In *Harris*, the State conceded that the defendant was entitled to a credit against all sentences. *Id.* This court stated,

> We are satisfied that the [S]tate's concession in *Harris* was inappropriate, and that the mandate of the court in respect to the consecutive sentence *has no precedential value, because the issue was not before it and because the court stated no rationale* which would justify a credit against the consecutive sentence. . . .

*Id.* at 663–64 (emphasis added).

Under our reading of *Wilson*, the only situation in which a holding based on a concession by the State may not have precedential value arises when the court provides no rationale or analysis of the subject of the concession and the subject of the concession is not disputed by the parties and is therefore not an

*Hockings*, 86 Wis. 2d 709, 720 & n.5, 273 N.W.2d 339 (1979). Under *Mathis* and *Schimmel*, the reason that a person was incarcerated is irrelevant to a determination of whether he or she was in custody. The State's assertion that custody only occurs if there is an increase in custodial status commensurate with the interrogation simply misses the point. Indeed, we can think of no situation in which a defendant is more clearly in custody, as envisioned by the *Miranda* Court, than when the defendant is confined in a prison or jail. Accordingly, we hold that Armstrong was in custody when he made all of the statements at issue in this case, because he was an inmate of the Racine County Jail at the time.

¶ 37. Next, we consider whether, at the time he made his statements, Armstrong was subjected to interrogation by the police officers.[29] Both parties agree that the seminal case on interrogation is *Rhode Island v. Innis*, 446 U.S. 291 (1980). Under *Innis*, an "interrogation" occurs when a person is "subjected to either express questioning or its functional equivalent." *Innis*, 446 U.S. at 300–301. More specifically, the Court stated:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to

issue before the court. In *Schimmel*, custody was an issue which was directly presented to the court and the court provided over a half-page of rationale for its decision that custody existed. *See Schimmel*, 84 Wis. 2d at 294–95. Therefore, this court does not believe that *Schimmel*'s precedential value is impaired in any way by virtue of the State's concession that custody existed.

[29] In the discussion which follows, we address the third issue raised by the court of appeals in its certification of this case.

either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id.* (footnotes omitted).

¶ 38.   This court adopted the *Innis* test in *State v. Cunningham*, 144 Wis. 2d 272, 276–82, 423 N.W.2d 862 (1988). We pointed out in *Cunningham* that the *Innis* test focuses on the perspective of the suspect, not the subjective intent of the police officers. *See Cunningham*, 144 Wis. 2d at 279–80. This court stated:

> Even where the officer testifies that his or her actions had some purpose other than interrogation, the action must be viewed from the suspect's perspective to determine whether such conduct was reasonably likely to elicit an incriminating response. If an impartial observer perceives the officer's purpose to be something other than eliciting a response, the suspect is also likely to view the officer's purpose that way.

*Id.* at 280.

¶ 39.   Applying the *Innis* test to the facts of this case, we conclude that at the beginning of the interview, the officers had no reason to know that their questions would likely elicit an incriminating response from Armstrong. The information provided to them by the bookstore employee gave them cause to believe that Armstrong was not even present at the time of the crime under investigation. However, the situation changed the moment Armstrong contradicted the

statement of the bookstore employee and said he was in the bookstore when Thomas died.[30] At that point, the officers should have known that their questioning was reasonably likely to result in an incriminating response. When Armstrong said he was there at the time of the crime, a reasonable person would have realized that Armstrong was a potential suspect and that questioning could therefore result in a confession.

¶ 40.    Nevertheless, even after Armstrong admitted that he was in the bookstore when Thomas died, the officers continued to question him about the events of that night. They indicated that they did not believe Armstrong's story about the route he took home and they challenged his version of the events which transpired inside the bookstore. Although Detective Mich testified that the officers in fact did not believe that Armstrong was a suspect and that they thought Armstrong was lying in order to cover for someone else, an objective observer could certainly have concluded from the officers' questions and confrontational conversation that their purpose was to elicit an incriminating response from Armstrong. From Armstrong's perspective, the officers' conduct placed him in the position of having to elaborate upon his story in order to defend himself and preserve his credibility. *Id.* Therefore, under *Innis* and *Cunningham*, the officers' words and conduct following Armstrong's statement that he was present at the bookstore when Thomas died constituted interrogation.

---

[30] Although the focus of our analysis is not the subjective perspective of the officers, we point out that Detective Mich agreed that Armstrong became a suspect only when he indicated that he had been in the bookstore when Thomas died. *See* Motion Hearing Tr., Jan. 19, 1996 at 41–42 (No. 97–0926–CR).

¶ 41. We have concluded so far that Armstrong was in custody for the entire duration of the interview and that Armstrong was interrogated from the moment he became a potential suspect until the end of the interview. Consequently, Armstrong was first subjected to custodial interrogation when he told the police he was at the crime scene when the crime occurred, because that is when interrogation first existed. At that point, the police officers should have administered *Miranda* warnings to Armstrong to ensure that his constitutional privilege to be free from compelled self-incrimination was protected.

¶ 42. It is undisputed, however, that Armstrong was not given his *Miranda* warnings until the end of the first interview, after he had made all of his incriminating oral statements. Because the police officers did not read Armstrong his *Miranda* warnings when the custodial interrogation began, Armstrong's oral statements are inadmissible and should have been suppressed by the circuit court. *See Miranda*, 384 U.S. at 478; *Mitchell*, 167 Wis. 2d at 686.

## IV.

¶ 43. Having concluded that the failure of police to administer required *Miranda* warnings renders Armstrong's oral statements inadmissible, we move on to consider the admissibility of Armstrong's written statement. Armstrong argues that his written statement is inadmissible because it was tainted by his earlier, unwarned oral statements. In support of his position, Armstrong cites *State v. Ambrosia*, 208 Wis. 2d 269, 560 N.W.2d 555 (Ct. App. 1997), in which the court applied the "fruit of the poisonous tree" doctrine of *Wong Sun v. United States*, 371 U.S. 471 (1963), in

holding that portions of the defendant's post-*Miranda* statement were inadmissible because they were tainted by his earlier, unwarned statement. *Ambrosia*, 208 Wis. 2d at 276–78. We reject Armstrong's argument and overrule the part of *Ambrosia* upon which Armstrong relies.[31] We hold instead that Armstrong's written statement is admissible pursuant to *Oregon v. Elstad*, 470 U.S. 298 (1985).

¶ 44.    In *Elstad*, police officers obtained a warrant to arrest the defendant, Elstad, for the burglary of a neighbor's home. *See Elstad*, 470 U.S. 300–301. The officers spoke with Elstad in the living room of his home. *Id.* at 301. After asking Elstad a few questions, one of the officers told Elstad that he suspected Elstad of involvement in the burglary. *Id.* Elstad responded, "Yes, I was there." *Id.* The officers then drove Elstad to the police station, where they administered *Miranda* warnings for the first time. *Id.* Elstad indicated that he understood his rights and wanted to talk to the officers. *Id.* He proceeded to give a complete oral account of his involvement in the crime. *Id.* The statement was typed into a written statement, which Elstad reviewed, initialed, and signed. *Id.*

¶ 45.    At trial, the court admitted Elstad's written statement into evidence, finding that it was given knowingly and voluntarily after a waiver of the rights protected by *Miranda*.[32] *Id.* at 302. Elstad was con-

---

[31] This court may overrule, modify or withdraw language from published decisions of the court of appeals. *Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997).

[32] The trial court suppressed Elstad's initial statement, "Yes, I was there," because of the officers' failure to administer *Miranda* warnings. *Oregon v. Elstad*, 470 U.S. 298, 302 (1985). The State did not challenge the suppression of that statement. *Id.*

victed of first-degree burglary. *Id.* The Oregon Court of Appeals reversed, concluding that there was not a sufficient lapse in time between Elstad's inadmissible statement and his later written statement to "insulate the latter statement from the effect of what went before." *Id.* at 303 (quoting *State v. Elstad*, 658 P.2d 552, 554 (Or. Ct. App. 1983)). The Oregon Supreme Court denied review.

¶ 46.   The United States Supreme Court granted certiorari, framing the issue in *Elstad* as "whether the Self-Incrimination Clause of the Fifth Amendment requires the suppression of a confession, made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." *Elstad*, 470 U.S. at 303. In a 6–3 decision, the Court answered this question in the negative and reversed the decision of the Oregon Court of Appeals. *Id.* at 300. The Court held that Elstad's written statement was not tainted by his earlier statement, and therefore, need not be suppressed. *Id.* at 318.

¶ 47.   The Court in *Elstad* started by rejecting Elstad's argument that a statement occurring after an unwarned statement must be suppressed under the "fruit of the poisonous tree" doctrine of *Wong Sun*. *See id.* at 304–05. In *Wong Sun*, the Court held that witnesses and evidence must be excluded if they are "fruits" of a search which violated the Fourth Amendment of the federal constitution. *See Wong Sun*, 471 U.S. at 485, 488; *id.* at 305–06. As the Court in *Elstad* noted, the *Wong Sun* rule applies equally to require the suppression of a confession obtained as a consequence of a Fourth Amendment violation such as an illegal arrest. *See Elstad*, 470 U.S. at 306; *Taylor v. Alabama*, 457 U.S. 687, 690 (1982).

361

¶ 48. In *Elstad*, however, the Court made a clear distinction between violations of the procedures set forth in *Miranda* and violations of the United States Constitution. *See Elstad*, 470 U.S. at 306. The key difference between violations of *Miranda* and the Fourth Amendment violations involved in *Wong Sun*, according to the *Elstad* Court, is that "a simple failure to administer *Miranda* warnings is not in itself a violation of the Fifth Amendment." *Id.* at 307 n.1. The Court explained:

> The *Miranda* exclusionary rule. . .serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use by the prosecution in its case in chief only of compelled testimony. Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*. Thus, in the individual case, *Miranda*'s preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.

*Id.* at 306–07. (citing *New York v. Quarles*, 467 U.S. 649, 654 (1983) and *Michigan v. Tucker*, 417 U.S. 433, 444 (1974))(footnote omitted). Therefore, the *Elstad* Court continued:

> If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension

of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.

*Elstad*, 470 U.S. at 309.

¶ 49.   Having concluded that the *Wong Sun* "fruit of the poisonous tree" doctrine did not apply, the *Elstad* Court set forth the following rule:

[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the condition that precluded admission of the earlier statement.

*Id.* at 314.[33] The Court reiterated this rule later in the opinion:

[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was vol-

---

[33] In *Elstad*, the Court was careful to mention that its decision did not alter the rule of *Miranda*, stating,

When police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief. . . .The Court today in no way retreats from the bright-line rule of *Miranda*. . . .

*Elstad*, 470 U.S. at 317–18.

363

untary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made.

*Elstad*, 470 U.S. at 318. When determining whether the second statement was made voluntarily, a finder of fact must look at the totality of the circumstances. *Id.* The *Elstad* Court noted that "[t]he fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative" in determining the voluntariness of the suspect's post-*Miranda* statements. *Id.*

¶ 50.  In this case, we are faced with a question nearly identical to the one addressed by the Court in *Elstad*. Although the officers technically violated *Miranda* when they failed to administer *Miranda* warnings prior to Armstrong's oral confession, there is no claim that Armstrong made his oral or written statements involuntarily.[34] Since Armstrong's written statement was given after Armstrong knowingly waived his *Miranda* rights, the written statement is admissible under *Elstad*.

¶ 51.  We hold first that the officers' failure to administer the *Miranda* warnings prior to Armstrong's oral statements was in the nature of a technical violation as conceptualized by the *Elstad* Court. The Court in *Elstad* drew a distinction between violations of *Miranda* and violations of constitutional rights. According to the Court, a failure to administer the *Miranda* warnings which was "unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free

---

[34] As we have already indicated, the circuit court specifically found that Armstrong's oral and written statements were voluntarily made. *See* Motion Hearing Tr., Feb. 2, 1996 at 19 (No. 97–0926–CR).

will" was insufficient to result in an imputation of taint to subsequent statements. *Elstad*, 470 U.S. at 309.

¶ 52. As noted previously, the circuit court found that Armstrong's oral statements were voluntary. *See* Motion Hearing Tr., Feb. 2, 1996 at 19 (No. 97–0926–CR). There is no evidence of any coercion or circumstances designed to undermine Armstrong's ability to exercise his free will. Detective Mich testified that there was no initial intent to interrogate Armstrong and that until they administered the *Miranda* warnings, the officers thought Armstrong was a mere witness to the events leading up to the crime. Moreover, less than forty-five minutes elapsed between the time at which the officers should have administered the *Miranda* warnings, when Armstrong told them that he was present when Thomas died, and the point at which they did read the *Miranda* warnings, at about 3:00 p.m. The officers did read the *Miranda* rights before the interview ended and Armstrong cooperated fully thereafter. Since under the totality of the circumstances, Armstrong gave his oral statements voluntarily, we uphold the circuit court's finding that the oral statements were voluntary. We conclude that the officers' violation of *Miranda* during the taking of the oral statements was merely a technical one that did not amount to a constitutional violation.

¶ 53. Given our conclusion that the officers only technically violated *Miranda* as to Armstrong's oral statements, Armstrong's subsequent written statement is admissible pursuant to *Elstad* as long as it was a voluntary statement made after a valid administration of the *Miranda* warnings as well as a knowing and voluntary waiver of the constitutional privilege which *Miranda* protects. As we have already indicated, the circuit court found that Armstrong provided the writ-

365

ten statement voluntarily after he had been read the *Miranda* warnings and had knowingly waived his rights. *See* Motion Hearing Tr., Feb. 2, 1996 at 19 (No. 97–0926–CR). Looking at the totality of the circumstances, we agree.

¶ 54. After Armstrong received his *Miranda* rights the first time, he signed the notification portion of the "Notification and Waiver Form." He also indicated to the officers that he understood his rights and would speak with them. Armstrong continued to cooperate with the officers by finishing up the map he was drawing and reviewed and corrected the written statement the officers gave him about two hours later. When Armstrong was read his *Miranda* warnings again after he edited the statement, he signed both parts of the "Notification and Waiver Form" and signed and initialed the statement. From this chain of events, we conclude that Armstrong knew his rights when he signed the written statement. Further, we agree with the *Elstad* Court that Armstrong's choice to continue cooperating and speaking after he received his *Miranda* rights each time is "highly probative" to our inquiry. Consequently, under the totality of the circumstances, Armstrong voluntarily provided his written statement, and he did so after receiving his *Miranda* warnings and knowingly and voluntarily waiving the constitutional rights safeguarded by *Miranda*.

¶ 55. Armstrong argues that the court of appeals' decision in *State v. Ambrosia*, 208 Wis. 2d 269, 560 N.W.2d 555 (Ct. App. 1997), governs this case. We disagree. In *Ambrosia*, the court of appeals concluded, based on *Wong Sun*, that "those portions of the post-*Miranda* statement tainted by the earlier statement must be suppressed." *Ambrosia*, 208 Wis. 2d at 277. As

we have already indicated, *Elstad* makes clear that the application of the "fruit of the poisonous tree" doctrine to violations of *Miranda* which are not also violations of the Fifth and/or Fourteenth Amendment is improper. Accordingly, we overrule the parts of *Ambrosia* in which the court of appeals made the above-quoted statements, relied upon *Wong Sun*, or applied the *Wong Sun* "fruit of the poisonous tree" rationale to a statement made after a *Miranda* violation.[35]

¶ 56.  In summary, we conclude that Armstrong's written statement is admissible under *Elstad*. Armstrong made the statement voluntarily, after a knowing and voluntary waiver of his *Miranda* rights, and the officers' failure to administer *Miranda* warnings prior to Armstrong's first statement was only a technical violation of *Miranda*, not a violation of the Fifth Amendment to the federal constitution as applied to the states through the Fourteenth Amendment. In addition, we overrule the parts of *Ambrosia* which refer to *Wong Sun* or apply the "fruit of the poisonous tree" doctrine.

## V.

¶ 57.  We have held that Armstrong's oral statements are inadmissible and that his subsequent written statement is admissible. We have yet to determine the effect of our holdings on the outcome of this case. Because we have held that Armstrong's written statement is admissible, the circuit court committed harmless error when it failed to suppress Armstrong's

---

[35] The language to which we refer occurs on pages 276 through 278 of the opinion. *See State v. Ambrosia*, 208 Wis. 2d 269, 560 N.W.2d 555 (Ct. App. 1997).

oral statements. Therefore, we affirm Armstrong's convictions.

¶ 58. The harmless error test appears in Wis. Stat. § 805.18,[36] which requires that this court "disregard any error or defect in the. . .proceedings which shall not affect the substantial rights of the adverse party." § 805.18(1). When a court has improperly admitted evidence, § 805.18 prohibits the court from reversing unless an examination of the entire proceeding reveals that the admission of the evidence has "affected the substantial rights" of the party seeking the reversal. § 805.18(2).[37]

¶ 59. The United States Supreme Court set forth the harmless error test in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Court ruled that a conviction must be reversed if:

---

[36] Although § 805.18 is part of the Wisconsin Rules of Civil Procedure, this court has ruled that Wis. Stat. § 972.11(1) renders § 805.18 applicable to criminal proceedings as well. *See State v. Dyess*, 124 Wis. 2d 525, 547, 370 N.W.2d 222 (1985); *see also State v. Ramos*, 211 Wis. 2d 12, 39 & n.6, 564 N.W.2d 328 (1997)(Crooks, J., dissenting). Section 972.11(1) provides, in pertinent part, that "the rules of evidence and practice in civil actions shall be applicable in all criminal proceedings unless the context of a section or rule manifestly requires a different construction."

[37] Wis. Stat. § 805.18(2) provides:

No judgment shall be reversed or set aside. . .in any action or proceeding on the ground of. . .improper admission of evidence. . .unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial.

368

there is a reasonable probability that, but for...[the] errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.... [T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.

*Strickland*, 466 U.S. at 694–95. This court adopted *Strickland*'s harmless error test in *State v. Dyess*, 124 Wis. 2d 525, 544–45, 370 N.W.2d 222 (1985). In *Dyess*, the court held,

[I]n respect to harmless versus prejudicial error...the test should be whether there is a reasonable possibility that the error contributed to the conviction. If it did, reversal and a new trial must result.

*Dyess*, 124 Wis. 2d at 543. Although, in *Dyess*, this court used the phrase "reasonable possibility" in place of the *Strickland* Court's "reasonable probability" language, · we explained that the phrases were "substantively the same." *See id.* at 544.[38]

---

[38] We have already concluded that the failure to administer *Miranda* warnings did not amount to a constitutional violation in this case. Nevertheless, we note that in *State v. Dyess*, 124 Wis. 2d 525, 370 N.W.2d 222 (1985), we held that the harmless error test we established in that case applies to "a wide range of trial errors," *Dyess*, 124 Wis. 2d at 545, "whether of constitutional proportions or not." *Id.* at 543.

In footnote 10 of *Dyess*, we pointed out that an exception to the general rule occurs for violations of constitutional rights "so basic to a fair trial that their infraction can never be treated as harmless error." *Id.* at 543 n.10 (quoting *Chapman v. California*, 386 U.S. 18, 23 (1967)). This court then listed all of the case law examples which the *Chapman* Court provided to illustrate

¶ 60.  In this case, we conclude that the circuit court committed harmless error when it ruled that Armstrong's oral statements were admissible. As a result of the circuit court's ruling admitting the statements, Armstrong entered a plea agreement and was convicted on all counts. An examination of the entire proceeding leads us to conclude that there is no reasonable possibility that a different result would have been reached had the circuit court suppressed the oral statements.

¶ 61.  At the same time the circuit court erroneously allowed the oral statements, the court properly admitted Armstrong's written statement. It is undisputed, and Armstrong himself testified, that the written statement simply reiterated the earlier oral statements. Since the oral statements were identical to other admissible evidence, the circuit court's failure to suppress them constitutes only an allowance of cumulative evidence of guilt. In other words, the same evidence would have come in to the proceeding through the written statement had the circuit court properly

---

this exception. *See id.* (citing *Payne v. Arkansas*, 356 U.S. 560 (1958)(right to remain free from coerced confessions); *Gideon v. Wainwright*, 372 U.S. 335 (1963)(right to counsel); *Tumey v. Ohio*, 273 U.S. 510 (1927)(right to impartial judge)); *see also Chapman*, 386 U.S. at 23 n.8. We note that the instant case does not involve circumstances similar to any of the listed cases.

We recognize that this area of law has been a source of some confusion in the past. *See* Comment, *Confusion in the Court — Wisconsin's Harmless Error Rule in Criminal Appeals*, 63 Marq. L. Rev. 643 (1980). This court has continued to apply the *Dyess* harmless error test, although it has been the subject of some debate. *See State v. Grant*, 139 Wis. 2d 45, 406 N.W.2d 744 (1987)(applying the *Dyess* test and containing concurring opinions which question the aptness of the *Dyess* test).

suppressed the oral statements. We can discern no basis for believing that Armstrong would not have entered his plea agreement or would not have been convicted had only the written statement been admitted by the circuit court. Therefore, we conclude that the admission of the oral statements constituted harmless error. Accordingly, we affirm Armstrong's convictions.

## VI.

¶ 62.  Finally, we summarize the conclusions we reach today.[39] First, we hold that Armstrong's oral statements are inadmissible under *Miranda*. The State bore the burden of proof on the issue of custodial interrogation and it failed to establish that the interview in which Armstrong made his oral statements did not constitute a custodial interrogation. Under *Mathis* and *Schimmel*, Armstrong was in custody because he was incarcerated when the officers conducted their first interview with him. Also, under *Innis* and *Cunningham*, Armstrong was interrogated from the moment a reasonable person would have realized that he was a potential suspect through the end of the interview. Because the officers did not read the *Miranda* warnings at the start of the custodial interrogation, Armstrong's oral statements are inadmissible.

¶ 63.  Further, we hold that Armstrong's written statement is admissible pursuant to *Elstad*. We reject Armstrong's contention that the *Wong Sun* "fruit of the poisonous tree" doctrine applies to preclude the admission of the written statement on the basis of taint from the earlier, inadmissible oral statements, and we over-

---

[39] In summarizing our conclusions, we will answer the questions certified by the court of appeals in the order in which they were presented.

rule the part of *Ambrosia* which applies the *Wong Sun* "fruit of the poisonous tree" rationale. Since the officers' violation of *Miranda* was of a technical nature and Armstrong made the written statement after a knowing and voluntary waiver of the rights protected by *Miranda*, Armstrong's written statement is admissible under *Elstad*.

¶ 64.    Because Armstrong's written statement is admissible, we conclude that the circuit court's ruling admitting Armstrong's oral statements constituted harmless error. There is no reasonable possibility[40] that the admission of the oral statements contributed to Armstrong's conviction because the written statement in which the oral statements were duplicated was admitted by the circuit court as well. Therefore, we affirm Armstrong's conviction.

*By the Court.*—The judgments of the circuit court in 97–0925–CR and 97–0926–CR are affirmed.

---

[40] As we have explained, the phrase, "reasonable possibility" in Wisconsin's harmless error test, *Dyess*, 124 Wis. 2d at 543, is identical in substance to the phrase, "reasonable probability" in the harmless error test used by the United States Supreme Court, *Strickland*, 466 U.S. 694–95. *Dyess*, 124 Wis. 2d at 544.