STATE of Wisconsin, Plaintiff-Appellant,

v.

Yen YANG, Defendant-Respondent.†

Court of Appeals

*No. 99–1246–CR. Submitted on briefs October 14, 1999.—Decided February 8, 2000.*

2000 WI App 63

(Also reported in 608 N.W.2d 703.)

†Petition to review denied.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *David J. Becker*, assistant attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *David J. Matyas*, of De Pere.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. HOOVER, P.J. The State appeals an order granting a motion to suppress statements and evidence.[1] The State contends that the trial court erred by

[1] This is an appeal from a nonfinal order. *See* WIS. STAT. § 974.05.

applying the fruit of the poisonous tree doctrine to *Miranda*[2] *violations that did not also infringe upon Yen Yang's constitutional rights. The issues presented are whether physical evidence derived from statements obtained in violation of Miranda and a subsequent Mirandized statement are admissible.*

¶ 2.    Addressing these issues in reverse order, we conclude that *Elstad*'s[3] two-part test, adopted by our supreme court in *State v. Armstrong*, 223 Wis. 2d 331, 366–67, 588 N.W.2d 606 (1999), applies to determine a subsequent *Mirandized* statement's admissibility. A court must first examine the statement obtained in violation of *Miranda*: if it was voluntary, there was no constitutional violation and therefore no "tainted fruit." The second inquiry is whether the subsequent *Mirandized* statement was voluntarily given after a valid waiver of *Miranda* rights. We conclude that all of Yang's statements were voluntarily given. Because the subsequent statement was obtained after a valid waiver of Yang's *Miranda* rights, it is admissible.

¶ 3.    We next hold that the admissibility of physical evidence derived from an unwarned statement is governed by the same rationale. If the statement taken in violation of *Miranda* was voluntary, the fruit of the poisonous tree doctrine does not apply. Because Yang's statements leading the police to physical evidence were voluntary, that evidence is admissible. We therefore reverse the suppression order and remand for further proceedings.

¶ 4.    The State also contends that the trial court erred by determining that Yang was in custody at the time of his unwarned statements and that the public

---

[2] See Miranda v. Arizona, 384 U.S. 436 (1966).

[3] *See Oregon v. Elstad*, 470 U.S. 298 (1985).

safety exception does not apply. We deem it unnecessary to consider these arguments because the State concedes that it is in fact only "concerned" with the circuit court's ruling regarding the physical evidence derived from Yang's first statement and with the *Mirandized* statement. Therefore, the trial court's order suppressing the pre-warning statement is not disturbed on appeal.

## BACKGROUND

¶ 5. The DePere Police Department received a call on September 9, 1998, that there were some "suspicious parties crawling the fence" to enter the Brown County fairgrounds from private property. The caller described the individuals as two Asian males. The activity was suspicious because, among other things, the gates to the fairgrounds were open so there was no need to climb over the fence to get in. The police responded and observed two Asian males, one of whom was Yang, walking in the area. The officers detained them and informed Yang that they had received a trespassing complaint. When the police asked Yang why he was in the area, he responded that he was looking for a lost ring.

¶ 6. Shortly thereafter, Brown County sheriff's deputies arrived at the scene. Lieutenant Paul Loppnow took over the investigation and asked Yang what he was doing. Yang again explained that he was looking for a ring. Loppnow told Yang that "we had a problem here over the weekend and there was a shooting here" and asked, "did you hear about that?" Yang indicated he had, but when pressed, disavowed any knowledge concerning the shooting. Loppnow asked Yang if he would go to the sheriff's department to speak with investigators, and Yang agreed. Loppnow

explained to Yang that he was not under arrest or in custody, and Yang nodded in the affirmative.

¶ 7. Yang was transported in a marked patrol car. Loppnow informed the driver that Yang was not under arrest or in custody but was willing to talk to the sheriff's investigators. Yang's hands were handcuffed in front of his body before he was placed in the squad. Loppnow later testified that had Yang been under arrest, he would have been handcuffed with his hands behind his back. Loppnow and other officers told Yang that he was being handcuffed for the officer's safety. Loppnow again told Yang that he was not under arrest and not in custody.

¶ 8. When Yang arrived at the sheriff's department, he was placed in a second floor interview room. The door was closed but not locked. The handcuffs were removed, and Yang was left alone for a short time. When Loppnow returned, he asked if Yang wanted something to drink or to use the bathroom. Yang responded that he did not. Loppnow told Yang that someone would be in to speak with him.

¶ 9. Loppnow returned to his office and was informed a short while later that a firearm might be hidden near the fairgrounds along the river. He was aware that young people frequently play next to the river in the general area in question and was therefore concerned about the possibility of someone discovering the firearm. Based upon his concern, Loppnow and other officers went to the fairgrounds and started searching for the firearm.

¶ 10. Sheriff's investigator Ronald Smith first began to talk to Yang between a half-hour and forty-five minutes after Yang had been placed in the interview room. First, Smith again asked Yang if he wanted something to drink. Yang responded no. After identify-

ing himself, Smith told Yang that he wanted to ask Yang about why he was at the fairgrounds. Smith did not give Yang *Miranda* warnings at that time. They talked for some time about the lost ring. There were interruptions while other officers provided Smith with information they obtained from other individuals. Smith was informed that Yang and his companions were not looking for a lost ring, but were looking for a firearm that had been involved in the shooting. After receiving this information, Smith believed Yang was involved in the incident. He told Yang that he wanted to know where the firearm was because he "didn't want any little kids to find the gun and end up hurting themsel[ves]." Smith also told Yang he expected him to cooperate. Yang said he would and informed Smith of the firearm's location. Smith left the room to relay the information to officers at the fairgrounds; they were, however, unable to locate the firearm based on the information Yang provided.

¶ 11.　Smith returned to the interview room and asked Yang whether he would be willing to go to the fairgrounds and point out the area where the weapon could be found. Before Smith could finish his sentence, Yang stood up and indicated he would cooperate. At that point, Smith asked Yang whether he understood that he had the right to have an attorney present. Yang said he understood his rights and wanted to cooperate; he just wanted to get it over with. Smith also told Yang that he had a right not to talk and again, Yang indicated he understood. Smith did not, however, give the complete *Miranda* warnings. Smith testified that normally he would have administered complete *Miranda* warnings but did not do so because he lacked the time. The officers at the fairgrounds wanted Yang right away, and Smith did not know how long it would take

to go through the *Miranda* warnings. Smith, another officer and Yang went to the fairgrounds. Yang assisted in finding the firearm by pointing out the area where it was located.

¶ 12.   Smith accompanied Yang back to the same interview room at the sheriff's department, where Smith read Yang the *Miranda* warnings.[4] Yang indicated that he understood them. Yang also read and signed a waiver form stating that he "understood everything." Yang then answered Smith's questions about the shooting incident and the recovered firearm. Yang's answers were reduced to writing and, after reviewing the written statement, Yang signed it.

¶ 13.   Yang was charged with two counts of aggravated battery, one count of carrying a concealed weapon, two counts of harboring or aiding a felon and one count of possession of a dangerous weapon by a child. The charges arose out of the shooting incident at the Brown County fairgrounds. Yang's primary role in the shooting was to hide the firearm that had been used. After the preliminary hearing, Yang was bound over for trial on all six charges. He filed motions seeking to suppress all of his statements to law enforcement officers and the firearm whose general location Yang revealed in his statements to Smith. The trial court suppressed all of Yang's statements and the firearm.

¶ 14.   The court decided that Yang was in custody at the time he gave his first statement. It determined that although the statement was voluntary, it must be suppressed because it was made without the benefit of *Miranda* warnings. The court then considered the postwarning statements and the firearm. Although the

---

[4] During the round trip and while at the fairgrounds, Yang was not handcuffed.

court acknowledged *Armstrong's* holding,[5] it distinguished it on the basis of factual differences. First, Armstrong was not a suspect until he incriminated himself, whereas Yang became a suspect based on information the authorities obtained from others. Second, Armstrong gave the same information in both his pre- and post-*Miranda* statements. In Yang's post-*Miranda* statement, however, in addition to merely acknowledging that he knew where the firearm was, he also admitted his involvement in the shooting incident. The court found ultimately that Yang knowingly and intelligently waived his *Miranda* rights and that his second statement to Smith was voluntary. It nevertheless concluded that the post-*Miranda* statement and the firearm were "fruit of the poisonous tree" and insufficiently attenuated from the pre-warning statement. The court therefore also suppressed the post-*Miranda* statement and the firearm. This appeal followed.

## ANALYSIS

¶ 15.    Initially, we briefly address the issues that we do not decide. First, the State contends that the circuit court erred by determining that Yang was in custody at the time his statements were taken and by failing to apply the public safety exception to the *Miranda* rule under the facts of this case. The State concedes, "[I]t is primarily the last two items [suppression of the postwarning statements and the firearm], and the ground upon which they were suppressed . . . with which the state is concerned." It apparently believes that Yang's pre-*Miranda* statement is not essential if the State can admit his post-*Miranda* confession. Because we conclude that Yang's postwarning

---

[5] *Supra* page 2.

statements and the firearm are admissible, we do not determine whether Yang was in custody or whether the public safety exception applies.[6] Our analysis relies upon the circuit court's determinations that Yang was in custody at the time of his pre-warning statements and that the public safety exception does not apply. Therefore, we do not disturb the circuit court's order suppressing the pre-warning statements, although they may be used to impeach Yang's credibility should he choose to testify. *See Harris v. New York*, 401 U.S. 222, 225–26 (1971).

¶ 16.    We also decline to address Yang's contention that he was illegally detained and that all resulting evidence should be suppressed. Yang raised the issue briefly at the suppression hearing. At the end of the time available for the hearing, the court told the parties, "if there was anything further that needs to be addressed from anyone's perspective . . . you can certainly submit that in writing. And I will . . . address those when we have a little more time . . . ." The record does not demonstrate that Yang availed himself of this opportunity so that the circuit court could address his

---

[6] The State certainly does not concede that Yang was in custody or that the public safety exception does not apply. Rather, we perceive its express identification of its primary concern as an admission that Yang's initial statement is of nominal evidentiary value. We appreciate the State's candor.

Yang's *Mirandized* statement contains at least the same information as the statement taken in violation of *Miranda*. Therefore, in light of our holding, resolving the custody and public safety exception issues would be, by the State's implicit acknowledgment, an academic exercise that this court cannot afford to entertain. *See, e.g. Cascade Mt. v. Capitol Indem. Corp.*, 212 Wis. 2d 265, 270 n.3, 569 N.W.2d 45 (Ct. App. 1997) (The time this court may devote to each case is limited.).

argument. He has therefore failed to preserve the issue for appeal. *See State v. Woods*, 144 Wis. 2d 710, 716, 424 N.W.2d 730 (Ct. App. 1988).

## STANDARD OF REVIEW

¶ 17.   Our analysis involves various issues that we decide under different standards of review. We will not upset the circuit court's evidentiary findings unless they are clearly erroneous. *See Armstrong*, 223 Wis. 2d at 352. We must determine the applicable law, which is a legal question that we answer without deference to the circuit court. *See State v. Keith*, 216 Wis. 2d 61, 69, 573 N.W.2d 888 (Ct. App. 1997). Whether those facts meet the appropriate legal standard presents a question of law that we decide independently of the circuit court. *See Armstrong*, 223 Wis. 2d at 353.

## ADMISSIBILITY OF THE *MIRANDIZED* WRITTEN STATEMENT

¶ 18.   The State contends that the circuit court erroneously suppressed the postwarning oral and written statements on the grounds that they were the tainted fruit of the earlier statements. Relying on *Armstrong*, it asserts that the "fruit of the poisonous tree" doctrine does not apply because Yang's constitutional rights were not violated.

¶ 19.   In *Armstrong,* our supreme court rejected the application of the "tainted fruit" doctrine to suppress a post-*Miranda* statement, despite an earlier *Miranda* violation.[7] *See Armstrong*, 223 Wis. 2d at

---

[7] In *Wong Sun v. United States*, 371 U.S. 471 (1963), the Supreme Court articulated the "fruit of the poisonous tree" doctrine. According to the *Wong Sun* majority, derivative evidence,

359–60. Armstrong was in custody on another matter and was being questioned as a possible witness to a homicide when he gave statements implicating himself in the murder and recounting his actions after the victim died. *See id.* at 338–39. After receiving this information but during the same interview, the police first advised Armstrong of his *Miranda* rights. *See id.* at 339–40. After waiving his *Miranda* rights, Armstrong finished a map directing the police to certain physical evidence. *See id.* Later, the officers returned to Armstrong's cell and gave him a written statement reflecting his earlier oral admissions. *See id.* at 341. After Armstrong read it and made some changes, the police administered a second *Miranda* warning. Armstrong waived his rights and signed the written statement, initialing his changes. *See id.* Later, Armstrong sought to suppress his statements as fruit of the poisonous tree. *See id.* at 359.

■

¶ 20.  In rejecting application of the "tainted fruit" doctrine, the court relied on *Elstad's* analysis. In *Elstad*, the Court examined the fruit of the poisonous tree doctrine and determined that it only applies to a constitutional violation. *See id.* at 305–09. Failure to

such as physical evidence, a confession, or the testimony of a witness, is not " 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Id.* at 488. Rather, derivative evidence must be suppressed as "fruit of the poisonous tree" if it was discovered by exploiting an illegal search. *See id.* Consequently, if the derivative evidence is discovered "by means sufficiently distinguishable [from the illegality] to be purged of the primary taint," *id.*, then it is admissible. For a discussion of attenuation, see *State v. Simmons*, 220 Wis. 2d 775, 780–81, 585 N.W.2d 165 (Ct. App. 1998).

administer *Miranda* warnings is not in itself a violation of the Fifth Amendment. "The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony." *Elstad,* 470 U.S. at 306–07. The Court concluded:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309.

¶ 21.   The analysis therefore involves a two-part inquiry. The first test is whether the original *Miranda* violation is also a constitutional violation. Because *Miranda* "serves the Fifth Amendment [and the] Fifth Amendment prohibits [the prosecution's use] of *compelled* testimony," *Elstad,* 470 U.S. at 306–07, the inquiry whether there was a constitutional violation usually concerns whether the defendant gave his statement freely and voluntarily. Therefore, if the statement was voluntary, it is *Miranda's* prophylactic rule and not a constitutional right that is violated. If involuntary, the Fifth Amendment is violated and we examine any subsequent statement under a fruit of the poisonous tree analysis. To determine voluntariness, we examine whether police coercion overcame the

defendant's free will. *See, e.g., State v. Clappes,* 136 Wis. 2d 222, 235–36, 401 N.W.2d 759 (1987).

¶ 22. *Elstad's* second test is whether the subsequent statement "was [also] a voluntary statement made after a valid administration of the *Miranda* warnings as well as a knowing and voluntary waiver of the constitutional privilege which *Miranda* protects." *Armstrong,* 223 Wis. 2d at 365. Assuming a valid waiver, the inquiry again addresses police coercion. That a 'defendant has already given a statement is, however, "no warrant for presuming coercive effect." *Id.* at 363. Indeed, "[t]he fact that a suspect chooses to speak after being informed of his rights is . . . highly probative in determining the voluntariness of the suspect's post-*Miranda* statements." *Id.* (citation omitted).

¶ 23. Yang nevertheless contends that the "fruit of the poisonous tree" doctrine has bearing on a Wisconsin court's *Elstad* analysis. He reads *Armstrong* as limited to its facts, and distinguishable because Yang, unlike Armstrong, was suspected of criminal activity when he made his initial statements, and Yang gave far more incriminatory information post-*Miranda* than pre-*Miranda,* while Armstrong provided the same information in both statements.

¶ 24. *Armstrong* is neither limited to its facts nor materially distinguishable. Yang misconstrues Armstrong's underlying rationale. Its analysis was not concerned with whether Armstrong was a suspect or with the amount of information given pre- and post-*Miranda*. Relying on *Elstad,* the *Armstrong* majority determined that, absent a constitutional violation in the first instance, there is no poisonous tree and consequently, no tainted fruit.[8] Therefore, the appropriate

---

[8] The *Armstrong* court overruled portions of *State v. Ambrosia,* 208 Wis. 2d 269, 560 N.W.2d 555 (Ct. App. 1997), stating:

inquiry in analyzing the admissibility of the post-*Miranda* statement is whether both statements were voluntarily given and whether *Miranda* rights were validly waived.

¶ 25.    Yang contends that his pre-*Miranda* statements were not voluntary. He claims that they were "the product of continual police pressure." We recently held that:

> [W]hether a defendant's statements to law enforcement are voluntary is determined in the first instance by an analysis of whether there were improper pressures exercised by the police. The inquiry ends if the law enforcement methods were not coercive.

*State v. Williams*, 220 Wis. 2d 458, 464–65, 583 N.W.2d 845 (Ct. App. 1998) (citation omitted). Only if the police practices were coercive does a court need to balance the accused's personal characteristics against the governmental activity that may have induced the statement. *See Clappes*, 136 Wis. 2d at 239–40.

¶ 26.    The circuit court found that the detectives engaged in no improper practices. This finding is not contrary to the great weight and clear preponderance of the evidence and we are thus bound by it. *See id.* at 235. Yang was not threatened, lied to or physically abused. No promises of leniency were made, and the

In *Ambrosia*, the court of appeals concluded, based on *Wong Sun*, that "those portions of the post-*Miranda* statement tainted by the earlier statement must be suppressed." *Ambrosia*, 208 Wis. 2d at 277. [W]e overrule the parts of *Ambrosia* in which the court of appeals made the above-quoted statements, relied upon *Wong Sun*, or applied the *Wong Sun* "fruit of the poisonous tree" rationale to a statement made after a *Miranda* violation.

*State v. Armstrong*, 223 Wis. 2d 331, 366–67, 588 N.W.2d 606 (1999).

interrogation was not lengthy. The court's finding is further supported by Yang's testimony that Smith, who took all of Yang's statements, "was pretty nice" and that the officers had not done anything he considered unfair.

¶ 27.   Notwithstanding its finding of no improper police practices, the court also considered several of the statements that Smith made to Yang: that the police knew Yang was looking for a firearm and not a ring and that a child might find the firearm. The court determined that these statements were not coercive and would not have caused Yang to give his statements involuntarily. In so determining, the court considered factors unique to Yang, such as his learning and thinking difficulties, but found upon the evidence as a whole that those factors did not demonstrate that Yang's statement was coerced. These findings lead inevitably to the legal conclusion that the statements were voluntarily given.

¶ 28.   We hold that the officers' failure to administer the *Miranda* warnings prior to Yang's oral statements was not a constitutional infringement. We next examine whether Yang's subsequent written statement is admissible pursuant to *Elstad's* second test, i.e., whether it was voluntarily given after a valid administration of the *Miranda* warnings and a knowing and voluntary waiver of the constitutional privilege that *Miranda* protects.

¶ 29.   The circuit court found that Yang provided his written statement voluntarily after he had been read the *Miranda* warnings and "intelligently and knowingly" waived his rights. The record supports that finding. After Yang received his full *Miranda* warnings, he signed the "Notification and Waiver Form" and

indicated to Smith that he understood his rights and would speak with him. Yang continued to cooperate with Smith by providing the written statement.

¶ 30.   Yang does not point to any specific acts of police coercion in obtaining the written statement. He nevertheless contends that "the continuum or evolution of the situation which [he] experienced [exhausted his] ability to exercise his free will . . . ." The essence of Yang's argument is that because of all that he had previously done to implicate himself, the taint of the earlier statements made his written statement involuntary.

¶ 31.   We may not presume that Yang's subsequent statement was coerced by virtue of his earlier unwarned admissions. *See Armstrong*, 223 Wis. 2d at 365. Indeed, Yang's choice to continue to cooperate and divulge additional information after he received his *Miranda* rights is "highly probative" to our inquiry. *See Armstrong*, 223 Wis. 2d at 363–64. We conclude that Yang voluntarily provided his written statement and that he did so after knowingly and voluntarily waiving his *Miranda* warnings. Accordingly, we determine that Yang's written statement is admissible.

## ADMISSIBILITY OF THE FIREARM

¶ 32.   The State next contends that we should extend the *Armstrong* holding to apply to physical evidence obtained as a result of a *Miranda* violation. It concedes there is no controlling United States Supreme Court or Wisconsin appellate decision,[9] but claims that

[9] Although discussed in several cases, no Wisconsin appellate court has yet decided whether *Elstad's* analysis applies to derivative *physical* evidence. *See State v. Kiekhefer*, 212 Wis. 2d

*Michigan v. Tucker*, 417 U.S. 433 (1974), and *Elstad*
"plainly teach that the 'fruit of the poisonous tree' doc-
trine has no application to physical evidence . . .
discovered as the result of statements obtained in vio-
lation of *Miranda*." Yang counters that revealing the
firearm's location was testimonial in nature and flowed
directly from the *Miranda* violation. The firearm, he
maintains, is derivative evidence from that violation
and should therefore be suppressed as "tainted fruit."
Yang agrees with the State that there is no controlling
precedent concerning the admission of the firearm.
Moreover, he argues that admitting evidence that
derives from a *Miranda* violation would set a danger-
ous precedent because future *Miranda* violations
would not be deterred, but perhaps encouraged.

¶ 33. The State does not dispute that Yang's act
of revealing the firearm's location was testimonial in
nature. Because it followed unwarned custodial ques-
tioning in violation of *Miranda*, it must be suppressed.
Whether the derivative physical evidence must also be
suppressed is governed by *Tucker* and *Elstad*.

¶ 34. In *Tucker*, the Supreme Court was asked to
apply the "tainted fruits" doctrine to the testimony of a
witness whose identity was discovered as the result of a
statement obtained in violation of *Miranda*.[10] In
declining to extend the doctrine to the facts in *Tucker*,
the Supreme Court noted that the unwarned question-
ing did not abridge Tucker's Fifth Amendment

---

460, 468–69, 569 N.W.2d 316 (Ct. App. 1997); *see also State v.
Harris*, 199 Wis. 2d 227, 236–37 n.5, 544 N.W.2d 545 (1996).

[10] The defendant had given the police the name of a pur-
ported alibi witness in his unwarned statement. The witness
not only failed to support Tucker's alibi, but provided additional
evidence incriminating Tucker. *See Michigan v. Tucker*, 417
U.S. 433, 436–37 (1974).

privilege, "but departed only from the prophylactic standards later laid down by this court in *Miranda* to safeguard that privilege." *Id.* at 445–46. Because Tucker's constitutional rights were not infringed, the Court determined that the "fruit of the poisonous tree" doctrine did not apply. *Id.* at 445 n.19. As a result, although the direct evidence (Tucker's unwarned statement) had to be suppressed, the derivative evidence (the testimony of the witness discovered as a result of the unwarned statement) was admissible. *See id.* at 445–46.

¶ 35.    Similarly, the *Elstad* majority held that the "tainted fruits" doctrine did not apply to the second confession for the same reasons the doctrine did not apply in *Tucker*. *See id.* at 308. Specifically, the Court held that "[s]ince there was no actual infringement of the suspect's constitutional rights, the case was not controlled by the doctrine expressed in *Wong Sun* that fruits of a constitutional violation must be suppressed." *Id.* As a result, although the direct evidence (the defendant's first confession) had to be suppressed, the derivative evidence (the second confession that was obtained as a result of the first) was admissible. *See id.* at 309.

¶ 36.    The logical extension of the Court's reasoning in *Tucker* and *Elstad* is that the "fruit of the poisonous tree" doctrine does not apply to physical evidence discovered as the result of a statement obtained in violation of *Miranda's* prophylactic rules, as opposed to a constitutional infringement.[11] The *Tucker* and

---

[11] Several federal circuits have determined that the "tainted fruits" doctrine does not apply to physical evidence obtained as a result of a nonconstitutional *Miranda* violation. *See, e.g., Winsett v. Washington,* 130 F.3d 269 (7th Cir. 1997);

*Elstad* holdings could not be clearer: the "poisonous tree" in *Wong Sun* is a constitutional violation and, absent such a violation, there is no tainted fruit. It is well established that the failure to deliver *Miranda* warnings is not itself a constitutional violation. *See, e.g., Elstad*, 470 U.S. at 306–09. Accordingly, derivative physical evidence obtained as a result of an unwarned statement that was voluntary under the Fifth Amendment is not "tainted fruit."

¶ 37.  The Supreme Court has answered Yang's policy argument regarding the "dangerous precedent" he claims we set today:

> [T]he absence of any coercion or improper tactics undercuts the twin rationales—trustworthiness and deterrence—for a broader rule.
>
> . . . .
>
> [P]olicemen investigating serious crimes [cannot realistically be expected to] make no errors whatsoever. If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself.

*Id.* at 308–09 (citations omitted).

¶ 38.  In light of our determination that a violation of *Miranda's* prophylactic rules by itself cannot be a "poisonous tree," whether the gun must be suppressed as "tainted fruit" turns on whether Yang's statements and testimonial act identifying the location

---

*United States v. Elie*, 111 F.3d 1135 (4th Cir. 1997); *United States v. Gonzalez-Sandoval*, 894 F.2d 1043, 1048 (9th Cir. 1990).

of the gun were involuntary. Because we have concluded that Yang's pre-*Miranda* statements were voluntary, we conclude that the gun is admissible.

¶ 39.   In conclusion, we hold that a subsequent *Mirandized* statement made after an earlier *Miranda* violation is admissible if both statements were voluntary and the subsequent *Mirandized* statement was given after a valid *Miranda* rights waiver. We conclude that Yang's unwarned and warned statements were given voluntarily and that there was a valid waiver. Accordingly, the *Mirandized* statement is admissible. We further hold that the admissibility of physical evidence derived from an unwarned statement is governed by the same rationale. If there was no constitutional violation, the fruit of the poisonous tree doctrine does not apply. Accordingly, that part of the order suppressing the non-*Mirandized* statement and the testimonial act of revealing the firearm is affirmed; that part of the order suppressing the post-*Miranda* statement and the firearm is reversed and the cause is remanded.

*By the Court.*—Orders affirmed in part; reversed in part and cause remanded.