## COURT OF APPEALS
## DECISION
## DATED AND FILED

## May 23, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1234-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2020CF682

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

   PLAINTIFF-APPELLANT,

 V.

CHRISTOPHER M. DEVENPORT,

   DEFENDANT-RESPONDENT.

APPEAL from an order of the circuit court for La Crosse County: ELLIOTT M. LEVINE, Judge. *Reversed and cause remanded*.

Before Blanchard, Nashold, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. The State appeals a circuit court order granting Christopher Devenport's motion to suppress incriminating statements that he made

to a jailer employed by the La Crosse County Sheriff's Office while Devenport was confined to a jail cell pending a trial on criminal charges. The circuit court concluded that the jailer violated Devenport's Fifth Amendment right to remain silent when the jailer failed to interrupt Devenport, as soon as Devenport started to give incriminating statements, and inform Devenport that the jailer was going to ask a mental health professional to communicate with him. The court credited the jailer's testimony, which we conclude can reasonably be interpreted as demonstrating only the following: the jailer passively listened to statements that Devenport spontaneously delivered. Based on this, we further conclude that, under the circumstances, the jailer did not violate Devenport's rights under the Fifth or Sixth Amendments, as incorporated by the Fourteenth Amendment. We also conclude that the statement that he seeks to suppress was given voluntarily under the pertinent constitutional test.[1] Accordingly, we reverse.

## BACKGROUND

¶2 On September 14, 2020, police arrested Devenport on suspicion of various offenses, and he was booked into the county jail. Four days later, he was charged with 19 crimes, including alleged acts of child sexual assault, physical abuse of a child, and felony domestic violence. Bond was set at $10,000.

¶3 While Devenport was still confined in the jail, on September 25, 2020, he had two interactions with the jailer within the course of about one hour.

---

[1] Neither side develops an argument that any provision in the Wisconsin Constitution is pertinent to this appeal, and therefore, our discussion is limited to the application of the United States Constitution, as interpreted by the U.S. Supreme Court and Wisconsin courts.

These two interactions, particularly the second, were the focus of the suppression motion granted by the circuit court.

¶4      What follows are the undisputed facts regarding the interactions, based on the only evidence on that topic that was before the circuit court at the time of its suppression decision:  a written statement of the jailer and her deposition in this case.[2]  The court implicitly credited all of the jailer's statements and did not find any to be inaccurate.

¶5      As a sheriff's office employee, the jailer had various responsibilities that involved supporting jail inmates, such as serving food and answering their questions.  None of her responsibilities as an inmate support person included investigating allegations of crime or wrongdoing by anyone.  She was not a sworn law enforcement officer, nor was she a medical professional with the jail's mental health unit.  Her "job description" did not include asking "guilt-seeking questions."

¶6      On September 25, 2020, during the first shift, the jailer was working as a "rover."  Rovers make "rounds" through the various blocks of the jail to "check on the well-being of all of our inmate population."  They "serve meals, answer questions, talk to inmates, [and] listen to inmates."

---

[2] As referenced below, in ruling on the suppression motion, the circuit court relied on the jailer's statements to establish what happened during the interactions, but the court also made reference to some other items in the record of the case as relevant to its ruling.

Still on the topic of the factual record about the interactions, in Devenport's motion to suppress, defense counsel quoted one paragraph of text that counsel described as "an unsolicited communication" that counsel had received from Devenport, in which Devenport purported to recount aspects of his interactions with the jailer.  But Devenport failed to provide any form of sworn testimony (including failing to testify in the circuit court) and the circuit court appeared to take no notice of the "unsolicited communication."  Therefore we ignore that text.

¶7      At approximately 9:05 a.m., the jailer noticed Devenport sitting on the floor of a cell, holding a towel around his neck and close to his face.  He appeared to be particularly upset—more upset than most people who are confined in the jail.  He was alone in the cell.

¶8      The jailer asked Devenport if he was okay; he responded that it was the birthday of one of his young relatives.  The jailer asked how old the child was; Devenport told the jailer the child's age.  She asked if he was going to call the child that day; he responded that he could not do that because he was subject to a "'no contact' with" the child—meaning he had a condition of bail that he have no contact with this child.  The jailer asked if there was anything that she could do for him; he responded that he could use a hug; she replied that she could not do that and asked if there was anything else that she could do for him.  The jailer asked if Devenport "had anybody that he could talk to, family or friends, somebody besides his attorney."  She asked this because Devenport was upset and talking to someone might help him feel better.  He said that the jailer should just say a prayer for him because he had a court appearance that day and he was hoping he would be released from jail.  She wished him luck, continued with the round she was on, and completed the round in the ordinary course.  The jailer testified that this encounter left her "generally concerned" about Devenport and the possibility that he might harm himself.

¶9      After she finished that round, the jailer was informed by a coworker of something about Devenport that the jailer had not known before:  Devenport was facing charges on "pretty significant" offenses, resulting in a relatively high bail amount.  This caused the jailer to realize that Devenport was unlikely to be released from jail that day, as he had just told her he hoped to be.  In turn, this caused the jailer to be more concerned about Devenport's "mental wellness" than

she had been during her first encounter with him; she had "genuine concerns for his well-being."

¶10     The jailer contacted a mental health professional in the jail ("the mental health professional"), requesting that he follow up with Devenport if, as the jailer expected, Devenport was not released from jail that day.  The mental health professional requested that the jailer ask Devenport to complete a form requesting a mental health consultation.

¶11     At approximately 9:30 a.m., the jailer conducted another round through Devenport's block and went to speak with him.  They had an interaction that she estimated lasted approximately 20 to 25 minutes, which she described as follows.

¶12     The jailer opened the door to Devenport's cell and told him that she was not sure how things would go for him in court that day, but if he needed a mental health consultation, the mental health professional wanted him to complete a mental health request form.  Devenport responded that he did not need the mental health consultation, that he was fine.  The jailer asked if he had anyone he could speak with outside the jail—family, friends, or anyone other than his attorney; he responded that he did not.  The jailer commented to Devenport that jail is a difficult place to be—all the more so because the COVID protocol then in effect required inmates such as Devenport to be allowed out of their cells only one hour per day for 14 days.  The jailer "reiterated" that if Devenport "needed to speak to anyone, all he ha[d] to do [wa]s ask."

¶13     At that point, without the jailer making any additional statement or posing any question, Devenport spontaneously launched into an extended narrative that covered multiple topics, apparently starting with the assertion that his father

5

had recently died as a result of cancer. This included numerous references to other relatives of his, including alleged victims in the pending criminal case. The narrative included statements that could incriminate him in this criminal case, which are the subject of the motion to suppress.

¶14 The jailer was surprised that Devenport gave the narrative. "[I]t just flowed out, just one [statement] after another." During the course of the narrative, the jailer did not interrupt Devenport or try to stop him from talking at any point, nor did she ask him any questions. In the jailer's written statement, which she adopted as accurate during her deposition, the jailer asserted:

> At no time during my interaction with [Devenport] did I ask him anything regarding the nature of his charges. I did not make any comments or ask any questions regarding his statements to me [during the extended narrative] regarding the [charged] incident[s] involving [alleged victims of the charged offenses]. My only purpose in the interaction that I had with [Devenport] was his mental well-being[,] with [him being] in … custody [of the sheriff's office]. I provided suggestions for him to speak with someone if he needed.

When asked in her deposition why she did not meaningfully interject or try to engage with Devenport during his narrative, the jailer testified:

> There was not an opportunity, I'm telling you. And I was -- this was a very shocking and different conversation to listen to … and I think I was just in awe of [--] I can't believe [he was] telling me all these things, and it was disturbing, to say the least.

¶15 Asked how this second interaction with Devenport concluded, the jailer testified, "I don't even recall how I just ended up walking out [of Devenport's jail cell], to be honest …. [A]side from leaving the block and going to do my duties, I don't think I said anything special. I don't recall that."

¶16   In general during her interactions with Devenport, the jailer tried to make him feel that the jail was a safe place and that she was there if he wanted to talk.

¶17   While Devenport was delivering his narrative, the jailer was not thinking that she would end up writing a summary of what he said. She "possibly" realized at the time that what he was saying to her had evidentiary value, but at the same time she did not think about how what he was saying could specifically be used against him in the criminal case. After leaving Devenport, however, as the jailer reflected on the second interaction, she decided to contact the police officer who had arrested him. The officer asked the jailer to write a statement summarizing her interactions with Devenport that morning, including what she recalled of his statements to her. She complied by writing the requested summary.

¶18   At no time did the jailer read to Devenport his *Miranda* rights; she never reads anyone their *Miranda* rights because it was not part of her job responsibilities to seek incriminating information.[3]

¶19   Devenport moved to suppress the content of his narrative on the grounds that his statements were obtained in violation of the federal constitution. The prosecution opposed the motion.

¶20   The circuit court granted the motion to suppress after making observations that included the following. The court noted that, as the jailer recounted, inmates in the La Crosse County jail on September 25, 2020, including

---

[3] *See **Miranda v. Arizona**, 384 U.S. 436 (1966).

Devenport, were living under difficult conditions because of what the court referred to as a "14-day lockdown" due to COVID.

¶21 The circuit court also made reference to a clinical psychologist's report of a mental health evaluation of Devenport dated October 22, 2020. The report was based on interviews that the psychologist conducted with Devenport on October 13 and October 20, 2020, and other information gathered by the psychologist. The report was created for the purpose of assisting the court in making decisions regarding Devenport's competency to proceed as a criminal defendant in the case.

¶22 The circuit court cited the following aspects of the competency report. The psychologist determined that—at least as of the time of the report, 27 days after the encounters with the jailer at issue—Devenport was competent to proceed in the criminal case. And, at least at that time, Devenport was aware of his constitutional right to remain silent. Devenport had never been arrested before. In 2019, Devenport had suffered from "some type of mental health breakdown," and showed signs of mental health issues in 2020 also.

¶23 Apparently referring to what the circuit court determined the jailer should have understood from his circumstances, appearance, and statements to the jailer on September 25, the court described him as "fairly vulnerable because of his mental state."

¶24 The court also appeared to consider it significant that, if a mental health professional, and not the jailer, had heard the narrative, Devenport's statements would have been kept confidential, and they would not be available as evidence in this case, due to the therapist-patient privilege.

¶25 Specifically referencing the Fifth Amendment, the circuit court concluded that suppression was required because, "[a]s soon as [Devenport] started to launch into" the narrative, and "essentially spew[ed] all the information out," the jailer should have interrupted him to "say, ['L]isten, let me get the doctor and we'll go from there.[']" Twenty to 25 minutes was "a long time" for the jailer "to sit there and listen to" Devenport while he was not merely "saying[, 'I]'m really depressed, I'm going to kill myself,[']" but instead was telling the jailer "this whole entire story." As a state actor, the jailer was obligated "to stop [him] and say, ['W]e'll get you a mental health person.[']"

¶26 The State appeals.

## DISCUSSION

¶27 The State does not dispute any of the following circumstances as of the time of the two encounters between the jailer and Devenport: Devenport was in custody; the jailer did not inform him of his *Miranda* rights; and the jailer qualified as a state actor for these purposes, equivalent to a police officer under the case law standards summarized below. The State argues that the jailer did not interrogate Devenport for purposes of the Fifth Amendment, that she did not deliberately elicit incriminating information for purposes of the Sixth Amendment, and that his statements were voluntary under the constitutional test. We now address each topic in turn, explaining why we agree with the State, based on the undisputed factual record.

¶28 Because there are no factual disputes, we need not address our standard of review for circuit court findings of fact made in the context of a suppression motion. In this context, our review of a circuit court's treatment of constitutional principles and applications of those principles is de novo, without

9

deference to the circuit court.  *State v. Harris*, 2017 WI 31, ¶9, 374 Wis. 2d 271, 892 N.W.2d 663.

## I.     FIFTH AMENDMENT RIGHT TO REMAIN SILENT

¶29     The Fifth Amendment protects against self-incrimination "whenever the State interrogates a suspect in police custody," and therefore statements that are the product of custodial interrogation conducted without *Miranda* warnings are generally not admissible at trial.  *See Harris*, 374 Wis. 2d 271, ¶11 (citing authority that includes *Miranda*).  This is because, if a suspect is not given the appropriate warnings before being subjected to custodial interrogation, any inculpatory statements the suspect makes are presumed to be involuntary. *Miranda*, 384 U.S. 436, 457 (1966).

¶30     "[C]ustodial interrogation can take the form of either express questioning or its functional equivalent."  *Harris*, 374 Wis. 2d 271, ¶15 & n.10 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.")).

¶31     "'Express questioning' does not encompass every inquiry directed to the suspect," but "only those questions 'designed to elicit incriminatory admissions.'"  *Id.*, ¶16 (quoted source omitted).  "It is the nature of the information the question is trying to reach, therefore, that determines whether it is inquisitorial.  If that information has no potential to incriminate the suspect, the question requires no *Miranda* warnings."  *Harris*, 374 Wis. 2d 271, ¶17.

¶32    Turning to the functional equivalent of express questioning, this involves a state actor employing "techniques of persuasion that, in a custodial setting, can create the same potential for self-incrimination even in the absence of an express question." *Id.*, ¶19. This "includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Id.* (quoting *Innis*, 446 U.S. at 301).

¶33    The Wisconsin test for functional equivalency asks how "a reasonable third-person observer … would expect the suspect to react to the officer's words and actions." *Id.*, ¶22. "This test is objective with respect to each of the participants in the interaction," and thus is not driven by "what any of the participants actually intended or understood." *Id.* Courts are to "reconstruct—as near to verisimilitude as possible—the entire context within which the dialogue took place" and then, based on that, determine "whether a reasonable observer would conclude that the suspect in the vignette would understand the officer's words and actions as reasonably likely to elicit an incriminating response." *Id.*, ¶23.

¶34    It is the State's burden to establish by a preponderance of the evidence that a suspect was not subject to custodial interrogation. *State v. Armstrong*, 223 Wis. 2d 331, 345, 588 N.W.2d 606 (1999), *overruling on other grounds recognized in State v. Halverson*, 2021 WI 7, ¶21, 395 Wis. 2d 385, 953 N.W.2d 847. Given that there is no dispute that Devenport was in custody, we address whether he was subject to interrogation.

¶35    On the express questioning issue here, we conclude that the State has established that the jailer did not pose questions to Devenport that were explicitly

designed to elicit incriminatory admissions. The evidence is such that a reasonable observer to these events would conclude that the jailer, in both of her encounters with Devenport, essentially conveyed only that he should feel free to tell her if he wanted the potential mental health consultation that she talked to him about. She did not make any statement to Devenport seeking information that would have a potential to incriminate him, *e.g.*, ask about what caused him to be incarcerated. What the jailer described, in unrebutted testimony, was Devenport giving a narrative that was not responsive to any question that the jailer posed to Devenport.

¶36 Turning to the functional equivalent issue, we conclude that the State has established that, taking into account all relevant facts, a reasonable observer witnessing the scenario here would have concluded that Devenport would not have understood that the jailer's words and actions were reasonably likely to elicit an incriminating response. Again, the evidence was that he did not launch into the extended narrative in response to any question of the jailer. Moreover, under the circumstances here the narrative would have come as a complete surprise to the reasonable observer and would have been seen as spontaneously given. *See* ***State v. Hambly***, 2008 WI 10, ¶66, 307 Wis. 2d 98, 745 N.W.2d 48 (An officer's "statement would not be viewed by an objective observer as the type of comment that would encourage the defendant to make some incriminating remark. A reasonably objective observer could not foresee that [the officer's] conduct and words would elicit an incriminating response from the defendant."). It is true that the jailer reported encouraging Devenport to "speak to anyone" or "speak with someone if he needed," but in the full context of the record, this was not an attempt to coax Devenport into giving the jailer incriminating information. Rather, taking the jailer's statements as a whole, it is clear that during her second

12

interaction with Devenport, her evident purpose in speaking with him was limited to encouraging him to speak to either family, friends, or to a jail mental health professional, about what might have been causing him distress at that time, including anxiety arising from or related to not being released from custody on bond.

¶37 Devenport argues that the jailer knew or should have understood that Devenport would have felt pressure to specifically discuss with the jailer why he was in jail based on what the jailer had learned by the time of the second interaction—that Devenport was distressed about the no contact order with the young relative, which the jailer understood was in some manner connected to his charges, and that Devenport was in jail on "serious charges." Devenport's argument on the functional equivalent issue is speculative and unsupported by the evidence. It overstates the evidence about what the jailer actually knew about Devenport's situation, according to her unrebutted testimony. She was not familiar with the specifics of the allegations against him and appeared to have taken no special interest in the particulars. Beyond that, contrary to Devenport's characterization of the evidence, the jailer's statements about her second interaction with Devenport do not demonstrate that the jailer prompted him to go beyond his already-stated concerns in talking with her.

¶38 The circuit court noted the unusually isolating conditions (unusual even for the jail) created by the COVID lockdown, the fact that Devenport apparently had no arrest history, and that he had some history of mental health challenges that rendered him "fairly vulnerable." Certainly, the reasonable observer of the scenario here would be aware of the isolating conditions and the fact that Devenport seemed upset. But it diverges from the proper analysis to attribute to the reasonable observer knowledge about Devenport's arrest history

and his mental health history without some evidence that this information would have been known to the jailer. Thus, the analysis takes into account the isolating conditions and that he appeared upset.

¶39 As for the circuit court's consideration of the potential availability of the therapist-patient privilege for any communications that Devenport could have had with someone from the jail's mental health unit, we fail to see this as a relevant consideration in the constitutional analysis. The issue here is not what might be considered to be best practices for those who manage and fund jail operations and for the mental health professionals who work in jails. The issue is whether the jailer violated Devenport's Fifth Amendment right to remain silent.

¶40 As the State notes, on the facts here, the effect of deeming the jailer's words and actions to be in violation of Devenport's Fifth Amendment right would render it a constitutional violation whenever a jailer does the following without first giving *Miranda* warnings: asks any upset inmate who has been held in isolating conditions about the inmate's present mental condition, and alerts the inmate to resources that might help alleviate potential mental health issues. This is not the correct legal standard. *See Harris*, 374 Wis. 2d 271, ¶30 ("to rise to the level of an interrogation, the officer's statements … must exert a compulsive force on the suspect: 'Interrogation must reflect a measure of compulsion above and beyond that inherent in custody itself.'" (quoting *Innis*, 446 U.S. at 300)).

¶41 The circuit court acknowledged that the jailer's statements and actions during her encounter with Devenport generally reflected that "she was trying to take care of him," not trying to obtain incriminating information from him. Further, as noted above, the court accepted as true the jailer's testimony that she (1) did not prompt the narrative with any question and (2) did nothing to

encourage him to continue speaking once he launched into the "flow[ing]" narrative. This is supported by her unrebutted testimony that she subjectively considered the narrative that he spontaneously delivered to be "very shocking."

¶42 The circuit court's decision rested on a misapplication of the law. This was the premise that, once an upset and isolated suspect who is in custody starts to volunteer statements that could tend to incriminate the suspect, the state actor is required by the Fifth Amendment to interrupt the suspect and direct the suspect to stop speaking.[4] This is not the law. *See **Tolliver v. Sheets***, 594 F.3d 900, 920 (6th Cir. 2010) ("Police may listen to volunteered statements, and need not interrupt a suspect who is volunteering information in order to deliver a *Miranda* warning." (citing *Miranda*, 384 U.S. at 478)). It is true that a state actor can cross into impermissible territory during the course of what begins as a volunteered statement by asking a suspect clarifying or follow-up questions. *See **Innis***, 446 U.S. at 300-01. But here, the evidence was that during Devenport's volunteered narrative, the jailer did not ask any questions—not even clarifying or follow-up ones.

## II. SIXTH AMENDMENT RIGHT TO COUNSEL

¶43 Under the Sixth Amendment, "[o]nce the right to counsel has attached and been asserted, the State must honor it." ***State v. Arrington***, 2022 WI 53, ¶40, 402 Wis. 2d 675, 976 N.W.2d 453 (citing ***Maine v. Moulton***, 474 U.S. 159, 170 (1985)), *cert. denied*, 143 S. Ct. 411 (Nov. 7, 2022). "[T]he Sixth Amendment prohibits the government from deliberately eliciting incriminating

---

[4] We explain separately below why we conclude that the statements were voluntary in the constitutional sense.

statements from a defendant, in the absence of counsel, after the defendant has been" formally charged. ***Arrington***, 402 Wis. 2d 675, ¶40 (citing ***Massiah v. United States***, 377 U.S. 201, 206 (1964)).

¶44     The State does not dispute that the interactions at issue here occurred after Devenport's right to counsel had attached, outside the presence of his attorney, and in the absence of any waiver of his right to counsel.

¶45     Devenport does not dispute the State's position that it is a defendant's burden to establish that a state actor deliberately elicited inculpatory statements in violation of the defendant's Sixth Amendment rights. *See* ***Kuhlmann v. Wilson***, 477 U.S. 436, 459 (1986) ("the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks"), *superseded by statute on other grounds as recognized in* ***Banister v. Davis***, 590 U.S. 504 (2020); *see also* ***Moore v. United States***, 178 F.3d 994, 999 (8th Cir. 1999).

¶46     It follows from our discussion above that Devenport fails to establish that the jailer deliberately elicited incriminating statements. No statement or action of the jailer here could have qualified as a deliberate elicitation of an incriminating statement.

### III.    VOLUNTARINESS

¶47     "When a defendant challenges the voluntariness of the statements [that the defendant] made to law enforcement[,] the State bears the burden of showing by a preponderance of the evidence that the statements were voluntary." ***State v. Dobbs***, 2020 WI 64, ¶72, 392 Wis. 2d 505, 945 N.W.2d 609. "We evaluate voluntariness in light of all the circumstances surrounding the

interrogation and balance the defendant's personal characteristics against the actions of law enforcement." *Id.* "We cannot properly label a statement involuntary unless there is 'some affirmative evidence of improper police practices deliberately used to procure a confession.'" *Id.* (quoted sources omitted). "A defendant's personal characteristics alone 'cannot form the basis for finding that the suspect's confessions, admissions, or statements are involuntary.'" *Id.* (quoted sources omitted). "'Coercive or improper police conduct is a necessary prerequisite for a finding of involuntariness.'" *Id.* (quoted source omitted).

¶48 Applying these legal standards, we conclude that the State here carried its burden to show that the statements were voluntary. On this record, there is no suggestion of "coercive" or "improper" conduct by the jailer. The circuit court found that the jailer did not act in a "nefarious" manner and was not "trying to do something wrong," such as intentionally trying to interfere with the attorney-client relationship.

¶49 Again, the circuit court in effect expressed the opinion that, under these circumstances, a jailer in the position of the jailer here should interrupt an isolated, upset inmate and tell the inmate that the jailer would summon a mental health professional with whom the inmate would share a therapist-patient privilege. But it was certainly not "coercive" or "improper" for the jailer here not to do this.

¶50 On appeal, Devenport distorts the record by arguing that the jailer "persistently urged him to speak about his distress related to his case." This suggests that the jailer probed Devenport's feelings about the charges against him. But the jailer specifically denied that and there is no contrary evidence. As noted above, to the extent that Devenport tries to suggest that the jailer knew or should

17

have known that Devenport would make the incriminating statements based on the jailer's few statements to him at the outset of the second encounter, this is speculative and not supported by evidence.

¶51 Similarly, Devenport on appeal suggests that the jailer used the mere "guise of being helpful and supportive" in order to "repeatedly question[]" him, implying a purpose to trick Devenport into making incriminating statements. This point is not supported by the record, as discussed above. In making the point, Devenport emphasizes that the jailer asked Devenport if he had anyone to talk to, not including his attorney. But the jailer's statement excluding the attorney from the scope of her inquiry serves to confirm the thrust of the jailer's message, which was to ask him whether he might like to communicate with a therapist about personal challenges—as distinct from communicating with his legal counsel about the prosecution against him. Devenport fails to support the suggestion that it was improper for the jailer to distinguish between support persons and legal counsel in this context.

## CONCLUSION

¶52 For all these reasons, we reverse the order granting the motion to suppress and remand the case for further proceedings.

*By the Court*.—Order reversed and cause remanded.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2021-22).

18